UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald Ray PAYSEUR, Defendant-Appellant.

No. 72–2928.

United States Court of Appeals,
Ninth Circuit.

Aug. 8, 1974.

Rehearing Denied Oct. 1, 1974.

Joseph Shemaria (argued), Los Angeles, Cal., for defendant-appellant.

W. Michael Mayock, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

Before DUNIWAY, CARTER and WRIGHT, Circuit Judges.

## OPINION

JAMES M. CARTER, Circuit Judge:

Defendant Donald Ray Payseur appeals from a judgment of conviction on two counts: (1) conspiring with others, in violation of 21 U.S.C. § 963, to import marijuana into the United States from Mexico, such importation being prohibited by 21 U.S.C. §§ 952(a) and 960(a)(1); and (2) importing marijuana into the United States in violation of 21 U.S.C. §§ 952(a) and 960(a)(1).

As a young adult offender (*see* 18 U. S.C. § 4209) he was sentenced under the provisions of the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5026. Imprisonment was suspended under 18 U. S.C. § 3651 and he was placed on probation on the condition that he serve the first six months in jail.

### The Issues

Payseur presents eight grounds for reversal:

1. The trial court's refusal to permit the issue of entrapment to go to the jury, and the curtailment of cross-examination on matters allegedly relevant to entrapment;

2. The trial court's instructions regarding the reliance the jury could place on one truthful witness;

3. The trial court's denial of a motion for continuance of the trial date;

4. The trial court's denial of access to the government's witness Pendley;

5. The trial court's improper admissions of hearsay statements;

6. The trial court's denial of a motion to suppress real evidence obtained by seizure and search of Payseur's flight bag;

7. The trial court's improper admission of three items of documentary evidence; and

8. The trial court's procedural error as regards selection of the jury.

Discerning no reversible errors in any of the trial court's actions, we affirm. Of the eight grounds asserted for reversal, only the first two (entrapment and instructions) require an extended discussion. The facts of the case are related in some detail in order to illuminate the discussion of the first ground.

### The Facts

The indictment was filed on July 21, 1971, charging in count I that Payseur and seven other defendants (Fisher, Talla, Idom, May, Reynolds, Masillo, and Nelson) had knowingly and wilfully conspired to import marijuana into the United States from Mexico.

Count II of the indictment charged that Payseur and May actually imported marijuana into the United States from Mexico. Count III charged Nelson and Reynolds with possession of such marijuana with intent to distribute, and count IV leveled an identical charge against Idom.

Defendant Fisher, Talla and Idom pleaded guilty. The rest went to trial, the jury finding them guilty. Only Payseur appeals.

At trial, the key witness for the government was an informant named Cleatus "El Duque" Pendley. He testified that prior to 1971 he and Fisher had been partners in the business of smuggling marijuana, but that their partnership ended when Pendley was arrested in February of 1971. In July of 1971, having been released on bond, Pendley sought out William Rosenblatt, a special agent for the United States Customs

Agency Service, and asked to become a government informant. Pendley was told to follow up and report any criminal activity he should observe, especially if Fisher were involved.

Soon afterwards, Pendley visited Fisher's home in California and asked his old partner what he had been doing lately. Fisher replied, "Why smuggling, of course."

Pendley and Fisher went to the house of Masillo in Riverside, California. They were told by Masillo that Nelson had called from Mexicali, Mexico, with the news that "some stuff" was available from Harvey. Fisher first called Nelson, who verified the information, and then called Harvey, arranging to meet with the latter in Mexicali that night. Pendley was invited.

After secretly informing customs agents of what was afoot, Pendley flew with Fisher by private Cessna airplane to Calexico, a California city just across the border from Mexicali. From Calexico they crossed into Mexicali and sampled Harvey's marijuana. It was good, and Fisher agreed to pay $60 per kilogram, with delivery to be made on the Mexican side of the border. Fisher remarked that he would pick up the goods by airplane because "his boy" needed some work to do and needed to make some money. Although Fisher did not say at that time who "his boy" was, the following evidence establishes that it must have been Payseur, the present appellant.

After Pendley and Fisher left Mexico they returned to California to arrange the details of financing and transporting the marijuana. Talla, whom they met in a Colony Kitchen restaurant in Corona, agreed to supply the cash. Pendley and Fisher then split up, but met again the next day at the house of Masillo. It was there that Pendley first met Payseur, who appeared to be a friend of Masillo's.

Pendley, Fisher and Payseur proceeded to the nearby Flabob Airport and took up the Cessna, Fisher piloting. As they circled over Riverside, Fisher pointed out a spot near the Jarupa Hills Trailer Park that he said would be a good place to land with the marijuana from Mexico. In response to an inquiry by Fisher, Payseur said he was sure he could put the airplane down there.

Later, after obtaining the purchase money from Talla, Fisher, Pendley and Payseur returned to the house of Masillo. Fisher, having entrusted the cash to Pendley's custody, then left the house, saying he was going to try to get additional money. During his absence, Pendley displayed the cash in his custody to those present, which included, besides himself and Payseur, Payseur's wife, Masillo and Masillo's wife. Masillo and the two women became excited at the sight.

When Fisher returned to Masillo's, Payseur said he knew where he could get an airplane to make the smuggling run. Pendley observed, "Well, the number one thing you need in smuggling, fellows, is an airplane to smuggle with. I think somebody ought to get on the phone and call one—get one."

Payseur called Aer-O-West Aviation and reserved a Cherokee airplane, commenting to Pendley that he, Payseur, "knew he could fly half the load up with it."

Fisher then gave the men final instructions. He handed Pendley a slip of paper upon which was written the name "Frank Curtis" (established as an alias of Idom). Fisher told Pendley that "Curtis" would supply the van for picking up the marijuana once the plane brought it down in California.

Fisher then departed, presumably going home. Payseur suggested to the other men present (Pendley, Nelson and Masillo) that the Corona Airport would be a good backup site in the event that anything went wrong with the spot near the Jarupa Hills Trailer Park.

Payseur, Pendley, Nelson and Masillo then went to Fisher's house. Fisher was there and introduced them to two new men, Reynolds and May. Fisher said that May would fly to Mexico with

Payseur to pick up the marijuana and that Reynolds would ride with Nelson in the pickup van.

Pendley promptly notified customs agents of the new development. Customs agent Grootendorst thus had an airplane ready to tail Payseur and May as they flew in the Cherokee airplane down to the Calexico airport. At Calexico, Payseur and May took on Fisher, who had arrived ahead, and the three men flew on to Mexico. Agent Grootendorst kept his plane aloft just above the border, waiting. After twenty-five minutes, he saw the Cherokee airplane coming back. He followed it to Palm Springs, California, where he lost the track.

Other customs agents were waiting, however, at the landing site in Jurupa Hills Trailer Park in Riverside. They watched as the Cherokee touched down and taxied over to a van, then flew off again five minutes later. The van promptly departed as well.

Shortly thereafter, the Cherokee landed in Corona. Customs agents were waiting there too. Payseur stepped out on the wing of the airplane, holding a flight bag. An agent announced his arrest, and Payseur, putting the flight bag down on top of the wing, stepped down to the ground. After Payseur's custody was ensured, the agent seized the bag. In it were various maps, used at trial as evidence of the crime.

At sundry places and times, Fisher, Talla, Idom, May, Reynolds, Masillo and Nelson were also arrested.

## I. *Entrapment*

Payseur contends that the judgment of conviction must be reversed because the trial court (a) improperly curtailed the cross-examination of a key government witness on matters relevant to the entrapment defense, and (b) erroneously refused to submit the issue of entrapment to the jury. Our perusal of the trial record convinces us, however, that the contested acts of the trial court were neither improper nor erroneous.

### a. *Curtailment of cross-examination*

Pendley, the key government witness, was subjected to lengthy cross-examination by five separate lawyers for the defense. Defendant Payseur now points to various instances where the court disallowed particular questions by the defense and concludes "It is thus apparent that the defense below did not enjoy the broad latitude of cross-examination necessary to explore exploiter Pendley's background, motives, credibility and involvement in entrapment. Though there is no doubt that many of the court's rulings were technically correct, the harsh curtailment of questioning undoubtedly dampened the defense vigor for the pursuit of truth."

■ Having studied the trial transcript, we agree with defendant Payseur that "many of the court's rulings were technically correct." But we do not agree that the tenor of the court's curtailment of questioning was harsh or unfair. The court disallowed questions probing the state of Pendley's mind, for Pendley was not on trial, and Pendley's state of mind is legally irrelevant to the entrapment issue. Legitimate inquiries, those having a material bearing on whether Payseur was induced to commit a crime to which he was not predisposed, were allowed. The court's discretionary power to limit cross-examination was thus unabused.

### b. *Refusal to submit entrapment issue to jury*

On the basis of the evidence presented, the trial court was correct in refusing to submit the issue of entrapment to the jury.

■ Entrapment is a relatively limited defense, not ordinarily constitutional in nature. United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366. It consists of two parts: (1) the defendant is induced by government agents to commit the particular acts charged, and (2) the defendant is not predisposed to commit the prohibited acts at any propi-

tious opportunity. United States v. Glassel, 488 F.2d 143, 146 (9 Cir. 1973).

■■ When a material question of fact on the issue of entrapment has been presented, the court must submit the issue to the jury. However, whether the elements of the defense have become an issue of fact for the jury is to be determined by the trial judge. Notaro v. United States, 363 F.2d 169, 175 (9 Cir. 1966); United States v. Glassel, 488 F. 2d 143, 146 (9 Cir. 1973).

Although there is no rigid formula for determining when sufficient evidence has been presented to create a question of fact for the jury on the issue of entrapment, the court in United States v. Christopher, 488 F.2d 849 (9 Cir. 1973), enunciated some guidelines which we find useful in the case at bar.

In *Christopher*, we said that "The slight testimony which we have held allows the issue of entrapment to go to the jury must still constitute some evidence of inducement or persuasion by the Government." *Id.* at 850–851. Further, the court specifically repudiated statements in *Notaro, supra,* to the effect that any assistance by a government agent in the commission of the crime was sufficient to present the issue of entrapment.

The court noted that "Despite the broad language of the *Notaro* footnote, the evidence of government intervention which requires a jury instruction on entrapment must tend to show that the crime may have been induced by the Government." *Id.* at 851, fn. 1; *accord,* United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366.

In *Glassel, supra,* the court found that the trial judge had a duty to rule on the issue of entrapment because the defendant's actions indisputably demonstrated his predisposition to commit the crime.

■ We have the same situation here. The record indisputably shows that Payseur was predisposed to commit the crime and the court therefore had a duty to rule on the issue of entrapment

as a matter of law. Fisher's reference to Payseur as his "fly boy" implies Payseur's regular participation in Fisher's previous smuggling operations. Payseur's interaction with the other members of the conspiracy reinforces the notion that he was a veteran. He showed no reluctance to commit the crime. Quite to the contrary, he displayed a degree of enthusiasm, expressing confidence in his ability to land an airplane in a tight spot, affirmatively approving certain plans made by Fisher, and even suggesting additional plans himself. The entrapment defense is available to "unwary innocents" but not "unwary criminals" like Payseur. Sherman v. United States, 356 U.S. 369, 372, 78 S. Ct. 819, 2 L.Ed.2d 848 (1958).

II. *The Instruction on Reliance on One Truthful Witness*

Defendant Payseur challenges the giving of one instruction as plain error. No objection was made to it below by any of the five defense attorneys. The instruction read:

"The testimony of a single witness may be sufficient to convince you beyond a reasonable doubt of the existence of *every essential element of the offense charged* if you believe beyond a reasonable doubt that the *witness is telling the truth*." (Emphasis added)

The instruction is similar to the example in Devitt and Blackmar, Federal Jury Practice and Instructions, § 12.17 (2nd ed. 1970). There the instruction read:

"The testimony of a single witness may be sufficient to convince you beyond a reasonable doubt of the existence of *an essential element* of the offense charged, if you believe beyond reasonable doubt that *the witness is telling the truth*." (Emphasis added)

Payseur's contention would apply both to the instruction given and the form instruction in § 12.17. The contention of the defendant focuses on the word "truth." He argues that the instruction permits a jury to convict if it concludes

that a witness believes he is telling the truth even though the jury thinks he is mistaken.

The argument is unpersuasive. The common sense interpretation of the instruction given is that the jury may convict on the basis of a single prosecution witness if it believes beyond a reasonable doubt that what the witness said happened is what in fact did happen.

■ ■ We hold that the instruction as given did not constitute plain error, hence the failure to raise an objection before the trial court forecloses a challenge now. Hormel v. Helvering, 312 U.S. 552, 558, 61 S.Ct. 719, 85 L.Ed. 1037 (1941).

Although we do not find error, we disapprove of the challenged instruction. District judges would be well-advised to modify the instruction, if they use it, to read as follows after the word "if":

". . . if you believe beyond a reasonable doubt that the witness is truthful; and believe that what the witness said happened is in fact what happened; and believe that the testimony of the witness covers each element of the offense charged."

The form instruction in § 12.17 is more limited in its scope than the one given in this case because of its reference to "an essential element of the offense charged" as contrasted to "every essential element of the offense charged" as appears in the instruction given. We prefer the more limited version. If § 12.17 is used it should read:

"The testimony of a single witness may be sufficient to convince you beyond a reasonable doubt of the existence of an essential element or elements of the offense charged, if you believe the witness has truthfully and accurately related what in fact occurred."

III. *The Other Assignments of Error*

The following contentions of the defendant are without merit:

■ a. *Denial of a motion for continuance of the trial date.* Payseur and four co-defendants first appeared for arraignment on August 27, 1971. Fisher and Talla were then fugitives. Idom later entered a plea of guilty and was sentenced. Upon motion of the five defendants, the arraignment was continued to September 7, 1971. On this date Payseur had not retained counsel and Ronald Bain was appointed to represent him. At Payseur's request, trial was set for November 9, 1971, two months away.

On the date set for trial, Godfrey Isaac appeared and moved to be substituted as attorney for Payseur and for a continuance of the trial date. In reply to the court's questions he stated, "in the event that the motion for a continuance is denied, which appears likely, nevertheless we will be prepared to proceed."

Contrary to Payseur's contention, there was no claim by Isaac that he was "utterly unprepared." The record does not reveal when Isaac was retained or when he began work on the case. After the jury was selected the court, on its own motion, continued the trial from November 9 to November 11. There was no abuse of the court's discretion.

b. *Alleged denial of access to Pendley, the government's informer-witness.* On September 7, 1971, the trial court sua sponte ordered the government to disclose whether an informer was expected to testify, but not his identity or his expected testimony. The government complied, and the disagreement of counsel as to whether there should be disclosure of the identity and address was entered in the discovery statement filed with the court.

■ A defendant is not entitled as a matter of right to the name and address of any witness. Rosenzweig v. United States (9 Cir. 1969) 412 F.2d 844, except as provided in 18 U.S.C. § 3432 for capital cases.

■ In any event, the defendant is ordinarily required to file a motion and make a sufficient pretrial showing of need before the government must comply with a request for the name or address

of a witness. United States v. Richter (9 Cir. 1973) 488 F.2d 170, 175. At no time did counsel for the defendants ask for a hearing on the matter or file a motion for discovery under Rule 16, F.R. Crim.P.

■ Moreover, counsel for the defendants were provided prior to trial with a statement that the witness Pendley had made to customs agents. Following Pendley's testimony on direct examination there was no claim by defendant Payseur of surprise or unpreparedness for cross-examination nor any request for a continuance. Pendley's direct testimony ended on a Friday afternoon and the trial did not start again until Monday afternoon.

c. *Hearsay declarations were properly admitted.* The acts and declarations of Payseur's co-conspirators subsequent to his arrest, but prior to arrest of the others, were admitted in evidence against Payseur. His arrest terminated his participation in the conspiracy "in the sense that his acts and declarations following his arrest do not bind, and may not be introduced against, other co-conspirators. . . . But the converse is not true. An unarrested co-conspirator still operating in furtherance of the conspiracy may say and do things which may be introduced against the arrested one if the conspiracy is still in operation." United States v. Wentz (9 Cir. 1972) 456 F.2d 634, 637. (Citations omitted)

■ Accordingly, the delivery of the marijuana to Pendley by Nelson and Reynolds, their subsequent arrest, the conversations of Pendley, Rosenblatt and Idom, Idom's samples of the marijuana and payment of $14,000 for it, and Idom's driving away with the marijuana-loaded van and his subsequent arrest, were all properly presented in evidence, since the conspiracy was still in existence.

■ Also, ". . . evidence of acts of co-conspirators which occurred after the entire conspiracy had ended and was complete may be introduced against all of the co-conspirators if the evidence tends to prove the existence of the conspiracy." *Wentz, supra,* at 637. (Citation omitted). Here the questioned evidence did exactly that.

■ Payseur complains of three instances where Pendley was permitted to testify to statements made by Fisher, which Payseur characterizes as recitals of past events. (*E. g.,* "Why [lately I have been] smuggling, of course.") Assuming they were not made in furtherance of the conspiracy, any error in admitting them into evidence was harmless beyond a reasonable doubt. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). None of the statements referred to defendant Payseur nor in any way connected him to the conspiracy. The evidence against him concerned events occurring within the period of the conspiracy, as alleged in the indictment, including events in which he participated.

■ d. *The motion to suppress the evidence obtained by the seizure and search of Payseur's flight bag was properly denied.* The record shows that the agents involved had probable cause to arrest Payseur and seize the flight bag. In addition, exigent circumstances existed which justified the immediate seizure of the bag. Co-conspirators were at large. The bag might have been taken or lost by third parties through inadvertence. Since probable cause and exigent circumstances existed, the government was not required to secure a search warrant. Chambers v. Maroney, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Hernandez v. United States (9 Cir. 1965) 353 F.2d 624, 627; United States v. Mehciz (9 Cir. 1971) 437 F.2d 145, 147, cert. denied 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971); United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

■ Even if the search was improper and the exhibits from the bag improperly admitted, the error was harmless. Harrington v. California, *supra.*

The maps and charts from the bag related only to whether the defendant had flown to Mexico. There was overwhelming evidence to this same fact based in part on surveillance by government agents and in part on the readings of the Hobbs meter in defendant's plane.

e. *Admission of documentary evidence.* There was no error in the admission of the evidence as to (1) the records of Aer-O-West Aviation; (2) a certain note written by witness Pendley, and (3) a certain note written by co-defendant Fisher.

f. *There was no error in procedures in selecting the jury.* The record shows that the only motion made regarding jury selection was that the government supply defendants with the names of jurors to which the government would exercise peremptory challenges. The motion was correctly denied. Pointer v. United States, 151 U.S. 396, 412, 14 S.Ct. 410, 38 L.Ed. 208 (1894).

Defendant argues about the use of a "jury book" by the U.S. Attorney. There was no showing such a book existed and no offer of proof of such a fact was made.

In any event, federal courts have consistently held that lack of access by the defense to the greater range of government information about potential jurors is not a ground for reversal. United States v. Costello (2 Cir. 1958) 255 F.2d 876, 883–884, cert. denied 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); Best v. United States (1 Cir. 1950) 184 F.2d 131, 141, cert. denied 340 U.S. 939, 71 S.Ct. 480, 95 L.Ed. 677 (1951); Christoffel v. United States (1948), 84 U.S.App.D.C. 132, 171 F.2d 1004, 1006, rev'd on other grounds, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949); Hamer v. United States (9 Cir. 1958) 259 F.2d 274, cert. denied 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577 (1959) (no error merely in use of jury book to which prosecution has exclusive access).

The judgment is affirmed.