UNITED STATES of America, Plaintiff-Appellee,

v.

**Frank Quiroz CARRASCO, Defendant-Appellant.**

UNITED STATES of America, Plaintiff-Appellee,

v.

**Lucindo RUIZ–ONTIVEROS, Defendant-Appellant.**

Nos. 75–3223, 75–3224.

United States Court of Appeals, Ninth Circuit.

June 4, 1976.

Rehearing Denied Aug. 20, 1976.

* The Honorable Manuel Real, United States District Judge for the Central District of California, sitting by designation.

Frederic F. Kay, Federal Public Defender (argued), Tucson, Ariz., for appellant in No. 75–3223.

Robert L. Murray (argued), Tucson, Ariz., for appellant in No. 75–3224.

Stephan M. Dichter, Asst. U. S. Atty. (argued), Tucson, Ariz., for appellee.

OPINION

Before DUNIWAY and TRASK, Circuit Judges, and BATTIN,* District Judge.

DUNIWAY, Circuit Judge:

A jury found Carrasco and Ruiz-Ontiveros guilty of conspiring to violate 21 U.S.C. § 841(a)(1) in violation of 18 U.S.C. § 371 and of possessing a controlled substance (heroin) with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846. It also found Carrasco guilty of using an interstate communication facility, a telephone, in furtherance of this scheme in violation of 21 U.S.C. § 843(b). Both appeal from the judgment of conviction, citing as error the district court's refusal to strike

---

* The Honorable James F. Battin, United States District Judge for the District of Montana, sitting by designation.

the testimony of a key witness, Maria Gamez, whose written statement given to a Drug Enforcement Administration agent had been destroyed by him in violation of the Jencks Act, 18 U.S.C. § 3500, and its failure to grant a mistrial because of inflammatory remarks made by the prosecutor during his summation. We reverse.

## The Facts

This case involves a conspiracy to sell 432 grams of heroin. The prosecution produced two witnesses, Maria Gamez, a paid government informant, and Ernest Lowe, a government agent. We summarize what each witness said.

*Maria Gamez:* On or about June 12, 1975, according to Gamez's direct testimony, defendant Carrasco contacted her and asked if she could locate a buyer for some heroin that he wanted to sell. Gamez, who had worked previously for the Drug Enforcement Administration, said that she thought she could.

On June 18 Carrasco delivered to Gamez a sample of the heroin which she passed on to the DEA. By the 20th the DEA and the conspirators were ready to proceed. The day began with Carrasco picking up Gamez and driving her to a house belonging to one Enrique Verde, another conspirator, where the transfer was to take place. Shortly after Gamez arrived, a woman identified as Frances Grijalva left, returning 10 to 15 minutes later carrying a large box and accompanied by two men, Enrique Verde and defendant Ruiz-Ontiveros. Inside the house, those three opened the box. It contained two large tin cans from which they removed small packages of a substance the defendants stipulated was heroin. At about that time Gamez talked with Ruiz-Ontiveros who told her that he had smuggled the heroin into the United States from Mexico and assured her that it was pure.

Having ascertained that the substance was indeed heroin, Gamez phoned the DEA and left a message to that effect. She and Carrasco then left the Verde house to rendezvous with the prospective purchaser. There was at least one additional phone call placed by Gamez during which Carrasco and DEA Agent Dennis Gonzales arranged for Agent Ernest Lowe to meet Carrasco in a parking lot adjacent to the Verde house.

*Ernest Lowe:* Agent Lowe testified that Carrasco and Gamez walked with him from the parking lot to the Verde house where he was introduced to the other participants. Two of them, Grijalva and Verde, left the living room to get the heroin, which was being kept elsewhere in the house. While they were gone, Lowe had a brief conversation with Ruiz-Ontiveros who again asserted that he had smuggled the heroin from Mexico and that it was undiluted. After Verde and Grijalva returned, they and Carrasco began weighing the heroin, at which point the DEA agents stationed outside moved in and arrested the conspirators.

## The Defense Theories

The two defendants relied upon different but not inconsistent theories to avoid conviction. Ruiz-Ontiveros maintained that he was an innocent bystander who had come to the Verde house in order to purchase a color television and that he knew nothing about the heroin. Carrasco did not contest his involvement with the heroin, but claimed that Gamez had entrapped him.

Ruiz-Ontiveros testified first. He said that he regularly travelled to Tucson in order to buy American goods which he sold in Mexico. On this particular sojourn he had purchased automotive parts and was looking for a color television, supposedly for sale at $45, when he was arrested. To substantiate his story, he produced three receipts for automotive parts purchased in the Tucson area. He admitted talking with Agent Lowe, but offered a different version of the conversation. He said that Lowe had asked him if he could smuggle some heroin for him from Mexico to Arizona. At first he declined, but later stated that he would if the price were right. In explaining this damning admission on re-direct, Ruiz-Ontiveros stated that he was poor and that Lowe had been extremely persuasive.

Carrasco, in his defense, produced two witnesses whose testimony contradicted Ga-

mez's. The first, Jesus Ybarra, stated that he had introduced Carrasco to Gamez at the latter's home and not at a public park as she had testified. The second, Frank Campuzano, a lifelong friend of Carrasco's, testified that Gamez had once passed Carrasco's house, gestured to him to come to her, and had conversed with him. Gamez had earlier denied the incident had ever occurred. The defense then rested without Carrasco's taking the stand.

The existence and destruction of a statement possibly covered by the Jencks Act first came to light while Ruiz-Ontiveros' counsel was cross-examining Gamez. He was attempting to portray his client as an innocent bystander by establishing his silence during the time the heroin sale was taking place. This was thwarted when Gamez testified that Ruiz-Ontiveros had then told her that he had smuggled the contraband from Mexico. Counsel immediately sought to impeach Gamez by pointing out that she had never mentioned this conversation in a statement made to DEA agents two weeks after the arrests. She replied that she had included it in a document she labelled her "original report." Further questioning revealed that this original report was a diary in which Gamez had made daily entries during the week in June in which the heroin sale had been arranged. Other testimony by DEA Agent Gonzales revealed that the original report may have contained as many as 10 handwritten, looseleaf sized pages, each of which Gamez had signed or initialled.

Gonzales stated he had shredded the diary in accordance with normal DEA procedures once he had incorporated its substance into his final report. He asserted that, to the best of his recollection, his report did not omit any substantive material which had been included in the original diary.

Both defendants made timely objections, asking the district court either to declare a mistrial or to strike Gamez's testimony. Both requests were denied. In asking us to reverse their convictions, defendants must show: (1) that the diary was a statement as that term is defined by the Jencks Act, 18 U.S.C. § 3500(e); (2) that its destruction in good faith does not excuse its production; and (3) that the district court's failure to order production or to strike Gamez's testimony was not harmless.

I. *Are the witness' notes a Jencks Act statement?*

■ The government's position is that Gamez's diary was merely notes used for recollection, not "a written statement made by said witness and signed or otherwise adopted or approved . . . ." 18 U.S.C. § 3500(e)(1). We disagree. Whatever the diary was before Gamez gave it to Gonzales, it became a statement, as that word is commonly used, once she gave it to him. A statement, unlike notes or a diary, seeks to transmit information from the declarant to the reader. By giving her diary to Gonzales, Gamez transformed what had been a diary not covered by the Jencks Act into a statement which was. *Cf. Goldberg v. United States,* —— U.S. ——, 96 S.Ct. 1338, at 1344, 47 L.Ed.2d 603 (1976) and Mr. Justice Stevens' concurring opinion, *id.; Rosenberg v. United States,* 1959, 360 U.S. 367, 369, 79 S.Ct. 1231, 3 L.Ed.2d 1304.

In fact the diary was more clearly a Jencks Act statement than the Gonzales report that the government offered in its stead. As Mr. Justice Frankfurter observed in *Palermo v. United States,* 1959, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287:

It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis on "substantially verbatim recital," and "continuous, narrative statements made by the witness recorded ver-

batim, or nearly so . . . ," that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation.

*Id.* at 352, 79 S.Ct. at 1224 (footnote omitted)

His warning is heeded far more faithfully by the production of a signed document in the witness' own hand than by the use of a second-hand report prepared from it by a government agent.

## II. *Good Faith Destruction.*

Having determined that Gamez's diary was a Jencks Act statement, we consider whether its destruction relieved the government of the duties and sanctions prescribed by the Act. We conclude that it did not.

■■■ The evidence is uncontradicted that DEA agents routinely destroy preliminary notes once their substance has been incorporated into a final report. We are not persuaded that the destruction in this case was motivated by a desire to suppress potentially exculpatory material.[1] For the purpose of this case, we assume that Gonzales thought that he was merely following routine procedure. However, a course of conduct is not necessarily reasonable merely because it is routine. "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." Holmes, J., in *Texas & Pacific Ry. v. Behymer,* 1903, 189 U.S. 469, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905. The Jencks Act was

designed to insure that government witnesses could be impeached only with those statements which could "fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." *Palermo v. United States, supra,* 360 U.S. at 350, 79 S.Ct. at 1223. That purpose is not served when a government agent summarizes a witness' statement in his report and destroys the verbatim statement. Whether or not Agent Stewart's conduct was routine, it was manifestly unreasonable in light of the expressed Congressional intent, and is no less a violation of the Jencks Act because it was pursued in good faith. *See United States v. Harrison,* D.C.Cir., 1975, 524 F.2d 421, 431–32; *United States v. Perry,* 1972, 153 U.S.App.D.C. 89, 471 F.2d 1057, 1062–66.

■■ Motive may be relevant in some unusual situations. Thus, when the prosecution is guilty of affirmative misconduct, a court may be compelled to conclude that it is attempting to conceal impeaching or exculpatory evidence. *United States v. Lonardo,* 6 Cir., 1965, 350 F.2d 523, 529; *see also Berger v. United States,* 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314. Or, "if the statement was destroyed in accordance with normal practice before the prosecution of defendant was contemplated, for a sufficient reason wholly unrelated to the prosecution, in good faith and with no intention to suppress evidence," *Ogden v. United States,* 9 Cir., 1962, 303 F.2d 724, 738, production may be excused. In general, however, good faith is the norm from which neither adverse inferences nor benefits flow.[2]

1. The following interchange occurred between Ruiz-Ontiveros' counsel and Agent Gonzales:
   Q. Just a couple more questions. You say you shredded these notes?
   A. Yes, sir.
   Q. How did you accomplish that?
   A. We have a shredding machine. Everything that we write or anything we're not going to use goes in the shredder. In other words, it's completely destroyed so no one else can get them and use them for another reason at a later date. Names, anything we have, telephone numbers, everything we

write, sir, is written out long-hand and then typed.
   Q. So what you're saying to me you shredded these materials so nobody else can subsequently see what's there?
   A. Yes, sir.
   [R. Tr. 114–15]

2. *Ogden II (Ogden v. United States,* 9 Cir. 1963, 323 F.2d 818, *cert. denied,* 1964, 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 36) is not to the contrary. In *Ogden II* we deliberately left open the question we answer today: "[W]hether

■ The case is not comparable to *United States v. Lane,* 6 Cir., 1973, 479 F.2d 1134, 1135–36, *cert. denied,* 414 U.S. 861, 94 S.Ct. 78, 38 L.Ed.2d 112, or *United States v. Terrell,* 2 Cir., 1973, 474 U.S. 872, 877, both of which are cited to us by the government. In those cases agents had destroyed their own rough notes after incorporating the substance of them into final reports. It may be that the agent—or witness, as in *Ogden II, supra*—who adapts a final report from preliminary memoranda will tailor his observations to fit his conclusion, but the danger is not nearly so great as when he revises the notes or the full statement of another. *Cf. Palermo v. United States, supra,* 360 U.S. at 352–53, 79 S.Ct. 1217. The benefits to defendants in those few cases in which revision produces substantial distortion may not justify the costs of retaining all rough notes in all cases. *See United States v. Comulada,* 2 Cir., 1965, 340 F.2d 449, 451, *cert. denied,* 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272. Moreover, preliminary notes of an agent from which he later prepares a report are not statements as that term is defined in the Jencks Act. *See State v. Maluia,* Hawaii, 1975, 539 P.2d 1200, 1208–11, and authorities cited therein. In the case at bar, however, the statement was written and signed and initialled on each page by the witness herself, and without any participation in its preparation by anyone else. It certainly was her statement when given to the agent.

■ Finally, the fact that Gamez's statement is no longer in the possession of the United States, *see* 18 U.S.C. § 3500(b), does not excuse what happened here. The Jencks Act is no less violated by the destruction of a statement than by its non-production. To hold otherwise would create an exception as broad as the Act itself.

sanctions are to be imposed if a producible statement has been destroyed in good faith and the information in the destroyed document relevant for impeachment is not otherwise available . . . ." *Id.* at 820–21. *Ogden II* did not involve the substantive revision of a witness' statement, merely its transfer from handwritten to typed copy.

*United States v. Lonardo, supra,* 350 F.2d at 530.

### III. *Harmless Error.*

■ We might still uphold the convictions if we could be persuaded that the failure to comply with the Jencks Act resulted in harmless error. *See Killian v. United States,* 1961, 368 U.S. 231, 240–44, 82 S.Ct. 302, 7 L.Ed.2d 256.[3] In this case that might occur because Gonzales' final *report* fully incorporated the Gamez notes, *id.* at 242; *Ogden v. United States, supra,* 303 F.2d at 738, or because the defendants' guilt was established beyond a reasonable doubt by competent testimony other than Gamez's, evidence strong enough to convince us that the error was harmless. *Lewis v. United States,* 8 Cir., 1965, 340 F.2d 678, 684.

Here, however, we cannot be persuaded that the error was harmless. Gamez was a key witness for the government. Discovering whether Gonzales' report substantially incorporated the contents of the shredded diary is not possible. It would require the district court to reconstruct a report no longer in existence using "the very witness[es] whose testimony the defendant seeks to impeach." *United States v. Johnson,* 9 Cir., 1975, 521 F.2d 1318, 1320. That alone makes the inquiry of dubious validity. *Id.* Even assuming the honest and full cooperation of Gamez and Gonzales, we doubt that they could remember the content of the document with sufficient clarity to enable the court to determine its usefulness as a tool of impeachment.

As our ignorance, and inability to remedy it, are caused totally by the conduct of the government, we are forced to infer that the Gonzales report did not fully incorporate Gamez's notes. This conclusion is bolstered

3. As the Jencks Act is not constitutionally required, we need not find the error harmless beyond a reasonable doubt in order to uphold the convictions. *United States v. Augenblick,* 1969, 393 U.S. 348, 356, 89 S.Ct. 528, 21 L.Ed.2d 537.

by Gamez's own testimony that the final report failed to mention something included in her diaries, namely that Ruiz-Ontiveros had informed her that he had smuggled the heroin from Mexico. However, to determine whether the prejudice was sufficient to compel reversal, we must ask how important Gamez's testimony was to each defendant's case. If it was superfluous, the trial judge's failure to strike it may have been harmless. *See, e. g., Sheer v. United States,* 5 Cir., 1969, 414 F.2d 122, 124, *cert. denied,* 396 U.S. 946, 90 S.Ct. 387, 24 L.Ed.2d 249. Her testimony, however, was certainly not superfluous.

Ruiz-Ontiveros' hopes for acquittal lay in persuading the jury to believe his testimony, rather than that of Gamez and Lowe. Each of them corroborated the other. Without Gamez' testimony, the jury might have believed Ruiz-Ontiveros, not Lowe.

Carrasco's only defense—and one that the district court agreed was available to him on the facts before it—was entrapment. The conviction could be sustained only if we were to conclude that the defense of entrapment was unavailable as a matter of law. While the evidence suggesting entrapment was sparse, it was sufficient to get the defense to the jury. *United States v. Payseur,* 9 Cir., 1974, 501 F.2d 966, 971; *United States v. Christopher,* 9 Cir., 1973, 488 F.2d 849, 850–51.

■ The government then had the burden of proof of non-entrapment. *Notaro v. United States,* 9 Cir., 1966, 363 F.2d 169, 175. The government does not dispute that its agent, Gamez, was actively involved in the conspiracy to sell heroin for the full week before the actual sale. Neither does it dispute that Gamez placed the telephone call upon which Count IV—charging a violation of 21 U.S.C. § 843 (use of a telephone to facilitate the sale of a controlled substance)—rests. This was not a case in which Gamez was merely the recipient of the contraband. *See United States v. Glassel,* 9 Cir., 1973, 488 F.2d 143, 146, *cert. denied,* 1974, 416 U.S. 941, 94 S.Ct. 1945, 40

L.Ed.2d 292; *United States v. Christopher, supra.*

We conclude that we must reverse both convictions. The testimony should have been stricken.

## IV. *Prosecutorial Misconduct.*

We need not decide whether the prosecution's summation was so inflammatory that the district court was required to declare a mistrial.

The allegedly improper remarks must be viewed in context. After the prosecutor had given what can best be described as a routine summation, the defense attorneys had their turns. Ruiz-Ontiveros' counsel was temperate, arguing that his client was simply in the wrong place at the wrong time. Carrasco's attorney, however, delivered a vitriolic attack upon the government's chief witness, Gamez. In essence he averred that because Gamez was a paid informant she would do anything in order to convict the defendants. His suggestion that she committed perjury was hardly subtle. In response to this the United States Attorney engaged in a rehabilitative effort which defendants claim was misconduct. We do not sanction the government's engaging in a "mudslinging" contest with the defendants, but we need not decide who won. We do not presume that, on a new trial, a similar contest will occur. We trust that it will not.

The judgments of conviction are reversed and the case is remanded for a new trial as to both defendants.