UNITED STATES of America, Plaintiff–Appellee,

v.

Richard Thomas RILEY, Defendant–Appellant.

No. 98–50399.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 14, 1999

Filed Aug. 25, 1999

Joseph T. Tavano, Ronis & Ronis, San Diego, California, for the defendant-appellant.

Richard C. Cheng, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: BRUNETTI, RYMER, and SILVERMAN, Circuit Judges.

RYMER, Circuit Judge:

It is seldom that we see a case anymore where a government agent intentionally destroys notes of a witness interview, for we held that the government could not do this twenty-three years ago in *United States v. Harris*, 543 F.2d 1247 (9th Cir. 1976). Nevertheless, that's what happened here (perhaps because the interview took place outside of this circuit). The notes were the confidential informant's Jencks Act "statement," *see* 18 U.S.C. § 3500, the witness was key to the defendant's entrapment defense, and there was no substitute for the notes except the recollections of the agent and the witness, which differed in several respects. The district court found that the government violated the Jencks Act, albeit not in bad faith, and that the defendants were prejudiced. Instead of striking the testimony, however, the court offered to allow further cross-examination and to instruct the jury that the notes had been improperly destroyed.

Richard Riley appeals from his jury conviction for conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), asserting error in the court's refusal to strike the witness's testimony. Although the district court's lesser sanction was sensible in light of cross-examination that had already seriously impaired the informant's credibility, we cannot say that the Jencks Act error was harmless in this case. As we have jurisdiction pursuant to 28 U.S.C. § 1291, we reverse.

## I

Riley was caught by a government reverse sting operation in which he purchased 125 pounds of marijuana from undercover agents. His erstwhile confederate, James Dufriend, cooperated with the government in this operation. Riley argues that Dufriend, in an effort to obtain leniency from the government, coaxed him into committing the crime. In short, Riley claims he was entrapped.

Dufriend was a fugitive who decided to cut a deal with the government by volunteering information about a planned drug conspiracy. He voluntarily surrendered to the authorities on March 14, 1997, and cooperated with the Drug Enforcement Administration. He allowed the DEA to install hidden cameras in his home and to monitor his phones. Through these means, the government managed to obtain video and audio-tapes of Riley planning and discussing the drug transaction with his co-conspirators, Dufriend and David Nunziato. Additionally, the DEA recorded conversations between Riley and DEA agents posing as drug dealers.

In the end, Riley negotiated the deal and purchased 125 pounds of marijuana from the undercover agents. The evidence of Riley's involvement in the drug transaction was overwhelming. Riley's only defense was that he was entrapped by Dufriend.

At trial, Dufriend's testimony directly undermined Riley's defense. First, Dufriend's testimony supported the inference that Riley was predisposed to commit the crime. According to Dufriend, Riley told him in 1989 that he had previously smuggled marijuana into the United States using a small sailboat. At the time of this conversation, Dufriend was assembling an experimental aircraft partly owned by Riley. Dufriend testified that the two also discussed the fact that the plane would be good for smuggling operations. It was this plane (the "Velocity") that became the centerpiece of the planned smuggling operation.

Second, Dufriend's testimony subverted Riley's claim that he was induced into committing the crime. Dufriend asserted that it was Riley who first brought up the idea of smuggling marijuana. According to Dufriend, this occurred at a meeting between Riley, Dufriend, and co-conspirator Nunziato in Saranac Lake, New York, in November 1996. He also testified that the three co-conspirators further discussed the proposal the next day. Dufriend claims that it was only after this proposal that he saw the opportunity to find favor with the government.

Contradicting Dufriend's testimony, Riley testified that he never had any conversation with Dufriend about marijuana trafficking until March 1997, around the time that Dufriend surrendered himself to the authorities. Riley denied discussing the use of the Velocity as a smuggling device or telling Dufriend that he had smuggled marijuana into the United States. He also denied proposing or even discussing smuggling at the Saranac Lake meeting, and he denied meeting with Dufriend and Nunziato the following day.

According to Riley, Dufriend was the first to suggest smuggling marijuana. Riley claimed that he had no intention of joining Dufriend, but Dufriend relentlessly hounded him to join the proposed operation. According to Riley, Dufriend pleaded for help, claiming that he was broke and had to have money because his wife needed surgery for a brain tumor. Additionally, Riley testified that Dufriend would not finish work on the Velocity (effectively holding Riley's investment hostage) unless Riley agreed to help.

Agent Ryan interviewed Dufriend for several hours at the time of Dufriend's surrender and took notes during the interview. After summarizing the interview in a two-page report, Ryan destroyed the original notes. Ryan also took notes during a subsequent two-hour interview with Dufriend, which occurred on May 16, 1997. Ryan summarized the interview in a report

and, once again, destroyed his original notes. Additionally, Ryan testified that he may have destroyed notes taken during other interviews of Dufriend.

Dufriend testified that during the interviews, Ryan would read back the notes to Dufriend to make sure that they were accurate. According to Dufriend, at the March 14 meeting, he told Ryan he had recently been approached about a scheme to smuggle marijuana. He also told Ryan that there was someone higher in the hierarchy than Nunziato, and that he was to find a source for the drugs.

Ryan's report states that Dufriend, Riley, and Nunziato had been smuggling drugs together for ten years. Dufriend testified that he did not tell Ryan this. In addition, the report does not mention the "higher up" that Dufriend testified he told Ryan of. Nor does it mention that Dufriend was to find a source for the drugs. It also identifies Riley as "John Riley," while Dufriend testified that he never used that pseudonym but called Riley by his given name, "Richard."

Riley and his co-defendant, Nunziato, moved to strike Dufriend's testimony on the ground that Ryan's destruction of his original notes violated the Jencks Act. The district court found that Dufriend had adopted Ryan's notes for purposes of the Jencks Act, making the rough notes Jencks Act material. After considering the culpability of the government and the injury to Riley, the court declined to strike Dufriend's testimony. It found that Ryan did not destroy the notes to hide anything, but that Dufriend's testimony was key to the government's case and the defendants had been prejudiced to some extent. At the same time, it noted that Dufriend had squirmed on the stand and was evasive, and that his credibility had been undermined by cross-examination. Therefore, the court allowed Riley to recall Dufriend and Ryan (which he did not do), and instructed the jury that the notes were improperly destroyed.

Riley timely appealed.

## II

The Jencks Act mandates that after a witness called by the United States testifies on direct, the United States must, on motion by the defendant, produce any statement of the witness in the possession of the United States that relates to the subject matter testified to by the witness. *See* 18 U.S.C. § 3500(b). A "statement," as defined by the Jencks Act, includes "a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). The Act provides sanctions for noncompliance:

> If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

18 U.S.C. § 3500(d). Federal Rule of Criminal Procedure 26.2, which basically implements the Jencks Act, states:

> If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the government who elects not to comply, shall declare a mistrial if required by the interest of justice.

Fed.R.Crim.P. 26.2(e); *see also* Fed.R.Crim.P. 26.2 advisory committee notes.

 Despite the mandatory ring of these provisions, a district court has discretion to refuse to impose sanctions for noncompliance, *see United States v. Echeverry,* 759 F.2d 1451, 1456 (9th Cir.1985), and Jencks Act violations are subject to harmless error analysis. *See Rosenberg v.*

*United States*, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). The inquiry tends to collapse in our cases. Generally, a court's decision to strike a witness's testimony for failure to comply with the Jencks Act "should rest on (1) a consideration of the culpability of the government for the unavailability of the material and (2) the injury resulting to the defendants." *United States v. Sterling*, 742 F.2d 521, 524 (9th Cir.1984); *see also United States v. Finnegan*, 568 F.2d 637, 642 (9th Cir. 1977). While a defendant need not prove prejudice to show a violation of the Jencks Act, *see United States v. Well*, 572 F.2d 1383, 1384 (9th Cir.1978), when there is no prejudice, a witness's testimony need not be stricken. *See, e.g., Sterling*, 742 F.2d at 525 (missing grand jury transcript was duplicative of other pretrial testimony that was given to defense counsel, counsel was able vigorously to cross-examine based on available materials, and witness's testimony was not necessary to prove the charges against the defendant). Thus, a new trial is only demanded by the failure to produce Jencks Act material if "substantial rights of appellant were affected by the failure to make that statement available." *United States v. Johnson*, 521 F.2d 1318, 1320 (9th Cir.1975).

■ The government does not dispute the district court's finding that Ryan's notes were a "statement" covered by the Jencks Act, *see United States v. Ogbuehi*, 18 F.3d 807, 810–11 (9th Cir.1994) (recognizing that interview notes read back to and confirmed by the witness may be a Jencks Act statement), or that it was wrong for Ryan to destroy the original notes he took of the conversation with Dufriend. Indeed, whether or not it was routine for Ryan to do so, destroying the notes was "manifestly unreasonable" and is "no less a violation of the Jencks Act because it was pursued in good faith." *United States v. Carrasco*, 537 F.2d 372, 376 (9th Cir.1976).

■ Rather, the government contends that the sanctions imposed were within the court's discretion because the case against Riley was strong, the witness "statement" in this case consisted of the agent's rough notes (not a writing by the witness), and it is hard to see how Riley was harmed. Although close, we do not agree. While the district court rested its decision on the correct factors, we cannot say the Jencks error was harmless given the fact that the statement was intentionally destroyed, there was no substitute for it except the recollections of the key witnesses themselves, Dufriend was the principal witness whose testimony was critical to Riley's entrapment defense, and the district court found prejudice.

Of all the cases we have considered, *Carrasco* is factually the closest. There, a government informant kept a handwritten diary of events leading up to a heroin bust. A DEA agent said he substantially incorporated the diary into his final report before shredding it in accordance with DEA procedures. *See Carrasco*, 537 F.2d at 376–77. After holding that the diary constituted a statement under the Jencks Act, we went on to analyze whether the error was harmless. *See id.* at 377. We suggested that it could be if the agent's final report fully incorporated the witness's notes or the defendants' guilt was established beyond a reasonable doubt by competent testimony other than the witness's testimony. *See id.* However, we were unpersuaded that the failure to comply with the Jencks Act resulted in harmless error because it was impossible to reconstruct the contents of the destroyed document except by using the very witnesses whose testimony the defendant sought to impeach, and because the informant's testimony and credibility were critical to entrapment-the defendant's only defense. In *Carrasco*, as in this case, the conviction "could be sustained only if we were to conclude that the defense of entrapment was unavailable as a matter of law. While the evidence suggesting entrapment was sparse, it was sufficient to get the defense to the jury." *Id.* at 378. This being the

case, we concluded that the testimony should have been stricken. *See id.*

Likewise, in *Well,* we were concerned with destruction of critical witness statements for which there was no substitute. There, a postal agent tape-recorded interviews of the three principal government witnesses, summarized the interviews, and then taped over the original recordings. Noting that "*Carrasco* held that sanctions are to be imposed under the Jencks Act if a producible statement has been destroyed and the information in the destroyed statement is not otherwise available," *Well,* 572 F.2d at 1384, we upheld the district court's order granting a mistrial and suppressing the witnesses' testimony.

By contrast, we have not required that testimony be stricken where a substitute for the missing statement was available. For example, in *Echeverry,* the Jencks Act statement was "generally duplicative of information previously disclosed to defense counsel" and the defense was "not deterred from a thorough cross-examination." 759 F.2d at 1456. In *Sterling,* the Jencks Act material was "essentially duplicative of other ... pretrial testimony" and the witness's testimony "was not necessary to prove the charges against the defendant." 742 F.2d at 525. In *Finnegan,* a vigorous cross-examination was possible because the "notes of an investigator who was present throughout the interview were produced and utilized by the defense." 568 F.2d at 642. And in *Harris,* we held that the refusal to strike testimony was harmless error because the defense did not contend that the agent's final report was incomplete or inaccurate. *See* 543 F.2d at 1253; *see also Rosenberg,* 360 U.S. at 371, 79 S.Ct. 1231 ("[W]hen the very same information was possessed by defendant's counsel as would have been available were error not committed, it would offend common sense and the fair administration of justice to order a new trial."); *cf. United States v. McKoy,* 78 F.3d 446, 450–52 (9th Cir.1996) (affirming mistrial where Jencks Act discovery was negligently produced but reversing suppression because the Jencks material would be available for cross-examination at new trial).

While more limited sanctions than striking the witness's testimony might be appropriate in some other circumstances, we do not see how recalling Ryan or Dufriend could cure the problem in this case. Both had been impeached, and the jury already knew that their recollections differed about what Dufriend told Ryan. Without Dufriend's statement (embodied in Ryan's notes), there was nothing to be gained from further cross-examination. More importantly, the case turned on whether the jury believed Riley's version or Dufriend's version of who enlisted whom. If Dufriend's testimony had been relevant only to Riley's involvement in the purchase of marijuana, then it might have been "superfluous" and not striking it harmless in light of the tapes which captured Riley in the act. *See Carrasco,* 537 F.2d at 378. But we cannot say that Dufriend's testimony was superfluous given Riley's defense. We simply cannot tell without the notes. This is the Catch–22 caused by the destruction of the notes. But since it was of the government's doing, it must live with the consequences. "As our ignorance, and inability to remedy it, are caused totally by the conduct of the government, we are forced to infer that the [Ryan] report did not fully incorporate [Dufriend's statement]." *Id.* at 377. Nor in this case can instructing the jury that Ryan should not have destroyed the notes substitute for the notes themselves.

In sum, we are not persuaded that the error is harmless in view of the lack of any substitute for Dufriend's statement other than the recollections of Dufriend and Ryan, the critical nature of Dufriend's testimony on Riley's entrapment defense, and the district court's finding of prejudice. This, combined with the intentional (albeit good faith) destruction of the notes, leads

us to conclude that we must reverse.[1]

REVERSED.

1. In view of this disposition, we have no need to consider Riley's additional arguments that destruction of the interview notes violated his Sixth Amendment rights and his right to due process.