UNITED STATES of America,

v.

Daniel UNGAR and Peter Giambalvo, Defendants.

No. CR–86–00036 (CPS).

United States District Court, E.D. New York.

Nov. 25, 1986.

As amended Dec. 30, 1986.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Edward A. Mc-Donald, Atty.-in-charge, U.S. Dept. of Justice, Organized Crime Strike Force, Bruce Maffeo, Brooklyn, N.Y., of counsel), for the government.

Thomas J. Cahill, New York City, for defendant Giambalvo.

Lawrence S. Goldman, Goldman & Hafetz, New York City, for defendant Ungar.

## OPINION AND ORDER

MALETZ, Senior Judge.[1]

The defendant Peter Giambalvo, convicted on a conspiracy charge at his jury trial of August, 1986, moves for a judgment of acquittal on the ground that the evidence was insufficient to establish his guilt beyond a reasonable doubt. He also moves to dismiss the indictment on the ground that preindictment delay prejudiced his defense, and for dismissal of the indictment or for a new trial on the ground that the government destroyed discoverable and potentially exculpatory material. His co-defendant Daniel Ungar joins these motions. For the reasons set forth below, the motions are denied.

### I.

*Background*

Giambalvo was previously a Supervisory Consumer Safety Inspector for the New York Import District of the United States Food and Drug Administration (FDA). As a supervisory inspector, he had responsibility for determining what goods imported into New York would be inspected. Daniel Ungar is a retired Chief of the FDA Import Section of the New York Import District. In January 1986, Giambalvo, Ungar, and other persons were indicted on a charge of conspiring, between June 1981 and July 1984, to defraud the United States government of the right to have the faithful and honest service of Giambalvo as an FDA employee and to have the laws and regulations of the FDA administered honestly and impartially. Giambalvo was also charged with bribery in connection with the inspection and release of foods entering the United States; Ungar was charged with aiding and abetting that bribery. Following a jury trial, Giambalvo and Ungar were convicted on the conspiracy charge and acquitted of the bribery charge.

The members of the alleged conspiracy included Giambalvo, Ungar, Demetrius

1. Of the United States Court of International    Trade, sitting by designation.

Christophides, a customs broker who became a government informant during the course of the conspiracy, and Mr. Kefaleas, an importer of figs. Pursuant to the conspiratorial agreement, Christophides received money from agents of Kefaleas in exchange for Christophides' agreement that figs imported by Kefaleas would not be inspected by the FDA. Such an assurance of non-inspection enabled Kefaleas to save money by removing the necessity of obtaining insurance against the possibility of FDA rejection of the figs, and by hastening the appearance of the figs on the market. Christophides represented that he had connections at the FDA who would ensure that the figs would be released without inspection. One of those connections was Giambalvo. The agreement was that Christophides would pay the money received from Kefaleas to Ungar, who in turn would pass the money to FDA inspectors, including Giambalvo.

The FDA form used during the period in question to authorize the entry and release of imported goods, with or without inspection, consisted of four attached, identical forms separated by carbon paper inserts. The top form was numbered FDA form 701 (701 form). The second form was numbered FDA form 702 (702 form). After completion, the 701 form was kept by the FDA; the 702 form was kept by whatever customs broker was involved in the importation. On each of the identical forms was a box which included the words "This Importation May Proceed Without FDA Examination" (release box). The signature of an FDA inspector in the release box indicated that the goods referred to in the form had been admitted into the United States without inspection. A large majority of the goods entering the New York ports were not inspected, for legitimate reasons.

Evidence at trial established that despite the fact that the 701 and 702 forms are identical forms of a single carbon set they may, after use, contain different information. When an FDA inspector decided that certain imported goods should be inspected, he would make a notation as to the nature

of the inspection on the 701 form in a felt-tip pen that would not leave a mark on the lower copies of the forms. For example, an inspector might use the pen to write "insan" on the 701 form, indicating that the goods in question should be inspected for insanitation; the 702 copy would not show that notation.

Even where an inspector had written in felt pen on a 701 form to request inspection, the goods in question would sometimes be released *without* inspection due to shortage of manpower or to other legitimate factors. An inspector would then ultimately sign the release box, using a regular pen that would show through onto the second, 702, copy. In consequence, a top, 701, form, might indicate that inspection of goods had initially been required, but the 702 copy of the form would show only that release had been authorized without inspection, with no indication that inspection had been originally requested.

Key evidence in the government's case was a large number of 702 forms that the government obtained from customs broker Christophides. Those forms concerned importations of figs by Kefaleas between September and November 1983, and each form showed a signature in the release box by an FDA inspector, some of them by Giambalvo. The government did not introduce into evidence the top, 701, copies of the forms. The defense had requested the corresponding 701 forms but had been informed by the government that the forms had been destroyed by the FDA in the regular course of business. Trial testimony of Mr. Joseph Faline, District Director of the FDA, established that it is FDA practice to retain 701 forms for only six months. On this motion the government represents to the court that in November 1984 it subpoenaed all original release forms from the FDA and that the FDA indicated that the forms for 1983 had already been destroyed. The FDA did produce the 701 forms for 1984, which were turned over to the prosecutor and, subsequently, to the defense.

Giambalvo at trial introduced into evidence the 701 forms for 1984 that had been obtained from the FDA. Those forms had felt pen markings showing that Giambalvo had requested inspection of 1984 shipments of figs by Kefaleas, although certain of the forms also had signatures in the release boxes indicating that the requested inspections had not in fact occurred. Defense counsel argued in summation that those requests for inspection made in 1984 indicated that Giambalvo had been requiring inspections of Kefaleas's figs, and that Giambalvo was therefore not party to the conspiracy to let the figs enter without inspection.

## II.

*Motion for Judgment of Acquittal*

■ Both Giambalvo and Ungar move for judgment of acquittal. Because neither defendant has met the heavy burden of showing an absence of evidence upon which a reasonable mind could conclude guilt beyond a reasonable doubt, the motions must be denied. *See United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984).

The evidence against Ungar was not merely sufficient, but overwhelming, and requires little discussion. Chief among that evidence were lengthy videotapes showing Ungar receiving money to be paid as bribes to FDA officials and including conversations between Ungar and Christophides directly implicating Ungar in the charged conspiracy. The jury was not required to accept Ungar's argument that he may have been pretending to Christophides that he would pass the money along to FDA inspectors while actually planning to keep the money all for himself. Consequently, Ungar's motion is denied.

Video and audiotapes provided strong evidence that a conspiracy to admit Kefaleas's figs without inspection did exist. The evidence that Ungar was a member of that conspiracy was less strong, but was sufficient to support a conviction, given that on a motion for acquittal "all reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to the government with respect to each element of the offense." *United States v. Mariani*, 725 F.2d at 865 (quoting *United States v. Rodriquez*, 702 F.2d 38, 41 (2d Cir.1983)).

Compelling evidence was Christophides's testimony that he had known Pete Giambalvo as an FDA employee for approximately twenty years, that Ungar had told him that "Pete" was one of the FDA contacts who would be used to get figs in without inspection, and that, as of 1983, Giambalvo was the only "Pete" in the FDA office. In fact, Christophides specifically testified that Ungar had told him that it was Pete *Giambalvo* who was the FDA contact. Additionally, Ungar, in the taped conversations between himself and Christophides, can be understood to have implicitly acknowledged that "Pete" was his FDA contact by the nature of his responses to Christophides's own references to "Pete."

Significant non-hearsay evidence linking Giambalvo to the conspiracy included evidence that at one point a shipment of Kefeleas's figs on the vessel the Zim Keelung was being held by FDA officials. Christophides testified that he called Giambalvo to inquire about the delay; that Giambalvo responded that the FDA might inspect the shipment; and that Ungar subsequently told him that Giambalvo's statement had been a "threat to get you moving." When Christophides then assured Ungar that the money would be paid within the week, Ungar promised that the releases would be signed the next day. A call was made from Ungar's to Giambolvo's residence later that evening; the next day, the figs were released by Giambalvo without inspection. A few days later, in a recorded call to Giambalvo at the FDA office, Christophides expressed "thanks" to Giambalvo "for the Zim Keelung." Giambalvo did not respond to that comment and, in response to a question by Christophides as to whether Giambalvo had met with Ungar, indicated that the FDA office was "not the place to—you know—talk." This sequence of events permitted an inference that Giam-

balvo had released the figs shipped on the Zim Keelung upon receiving an assurance of future payment.

There was also evidence of numerous phone calls by Ungar to Giambalvo's home and to the home of another FDA inspector who the record indicated was involved in the conspiracy. The frequency and timing of these calls, considered in conjunction with other evidence, permitted an inference that the calls were connected with the admission of shipments of Kefaleas's figs. The fact that the calls ceased in 1984 when the callers were informed that their records had been subpoenaed strengthened that inference. It is of significance, too, that in early 1985 an agent confronted Giambalvo with the fact that records showed calls between Ungar and Giambalvo through late 1983, to which Giambalvo responded, in a false exculpatory statement, that the toll records were not accurate and that he had not spoken with Ungar for a couple of years.

This evidence was sufficient to establish that Giambalvo was a member of the charged conspiracy. Therefore, Giambalvo's motion for judgment of acquittal is denied.

### III.

*Pre-indictment Delay*

Giambalvo contends that the 701 forms for 1983, had they not been destroyed, would have greatly strengthened his defense since they would have shown that he was requesting inspections of figs in 1983. He argues that had his indictment not been delayed, he would have been able to obtain those forms prior to their destruction. He

therefore moves for dismissal of the indictment on the ground of preindictment delay. The period of delay is a little over two years, calculating from the last alleged overt act of Giambalvo.[2]

#### A. *Sixth Amendment*

■ Giambalvo bases his motion in part upon the Sixth Amendment right to a speedy trial. Such reliance is inappropriate. The right to a speedy trial arises only following an indictment, an information, or an arrest to answer a criminal charge; it does not apply to preindictment delay. *See United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982); *United States v. Marion,* 404 U.S. 307, 313–23, 92 S.Ct. 455, 459–64, 30 L.Ed.2d 468 (1971); *United States v. Elsbery,* 602 F.2d 1054, 1058 (2d Cir.1979) (it is indisputable that the sixth amendment speedy trial right does not apply to preindictment delay), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979).

#### B. *Fifth Amendment*

Giambalvo also relies upon the fifth amendment right to due process. A defendant moving to dismiss for preindictment delay on fifth amendment grounds has the heavy burden of demonstrating actual prejudice from the preindictment delay, and the proof of prejudice must be definite, not speculative. *See United States v. Birney,* 686 F.2d 102, 105–06 (2d Cir.1982); *United States v. Elsbery,* 602 F.2d at 1059. The defendant must also show unjustifiable government conduct. *See Elsbery,* 602 F.2d at 1059; *United States v. Marion,* 404 U.S. at 324, 92 S.Ct.

---

**2.** Giambalvo argues that the period of delay should be calculated from his own last alleged overt act, not from the end of the conspiracy as a whole. The last alleged overt act by any conspirator occurred in July 1984; the last act alleged to have been committed by Giambalvo occurred in November 1983; the indictment was returned in January 1986. Regardless of how the period of preindictment delay is calculated, it cannot be doubted that the government did not act improperly at least insofar as it delayed bringing the indictment until July 1984, the end of the alleged conspiracy. *See United*

*States v. Lovasco,* 431 U.S. 783, 792–95, 97 S.Ct. 2044, 2049–51, 52 L.Ed.2d 752 (1977) (investigative delay is fundamentally unlike delay undertaken solely to obtain tactical advantage; to compel filing of charge against one participant would cause problem if more than one person or illegal act involved in transaction); *United States v. Langella,* 776 F.2d 1078, 1083 (2d Cir. 1985) (no unconstitutional preindictment delay where delay due to government need to preserve evidence and maintain secrecy in investigation), *cert. denied,* —— U.S. ——, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986).

at 465 (dismissal of indictment required if preindictment delay caused substantial prejudice and delay was intentional device to gain tactical advantage over the accused); *United States v. Lovasco*, 431 U.S. 703, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) (due process inquiry must consider the reasons for the delay as well as the prejudice to the accused).

■ Giambalvo has not met this burden of proof, since his claim of prejudice—specifically, his claim that the destroyed forms in fact contained notations requesting inspection—is speculative. The information as to whether the forms contained such notations is peculiarly within Giambalvo's knowledge. However, defense counsel states in his affidavit merely that

> it is [Giambalvo's] contention that [the forms] would demonstrate that he had in fact given directions to FDA inspectors to sample the figs imported by Kefaleas in 1983 by making handwritten notations on the yellow [701] forms.

Affidavit of Thomas J. Cahill, 8/26/86, ¶ 7. This affidavit cannot serve as evidence that Giambalvo in fact made such notations, for it merely asserts that Mr. Giambalvo so contends: counsel has neither made a sworn assertion based on information and belief to support his argument, nor presented an affidavit from his client or any other person. Were the mere assertion that another person is making a contention as to materiality sufficient to establish the materiality of destroyed documents, the requirement of proof of actual prejudice would be a nullity. *Cf. United States v. Valenzuela-Bernal*, 458 U.S. 858, 870–73, 102 S.Ct. 3440, 3448–49 73 L.Ed.2d 1193 (1982) (unavailability of deported witnesses did not relieve defendant of duty to make some showing of their materiality, especially

where no one knew better than defendant what the deportees had said); *United States v. Lawson*, 683 F.2d 688, 694 (2d Cir.1982) (defendant convicted of bank robbery did not establish prejudice based on destruction of bankteller's notes during period of preindictment delay where no showing that the notes contained important evidence).

■ In the absence of the affidavit, the only evidence suggesting that Giambalvo made notations on the 1983 forms is the evidence that he made such notations on the 1984 forms. However, on the facts of this case, that evidence, does not by itself provide a non-speculative basis for concluding that the 1984 forms contained requests for inspection. Testimony indicated that as of 1984 Giambalvo had reason to know he was under investigation, and so had a motive to request inspection that was not present in 1983.[3]

Similarly speculative is Giambalvo's claim that the preindictment delay had a causal relationship to his inability to obtain the 1983 forms. His claim of prejudice results from the destruction of 701 forms dating from November 1983 and before. Because it was FDA policy to destroy 701 forms after six months, the forms may have been destroyed before the end of the conspiracy in July 1984. Consequently, Giambalvo has not established a nonspeculative basis for concluding that it was delay in returning the indictment that resulted in his inability to obtain the destroyed forms.[4] *Cf. United States v. Elsbery*, 602 F.2d at 1059 (defense argument that antagonistic witnesses would earlier have cooperated with defense did not establish prejudice from delay because witnesses' change of heart might have occurred even if indictment brought sooner).

---

**3.** Specifically, in early 1984, Giambalvo learned that his phone records had been subpoenaed. After this, the frequent calls between Ungar and Giambalvo ceased. This evidence that Giambalvo had reason to know he was under investigation as of the beginning of 1984 suggests that there was substantial reason for him to perform his duties differently beginning in 1984. Consequently, the fact that Giambalvo made requests

for inspection on 1984 forms does not by itself provide a sufficiently non-speculative basis for concluding that there were similar notations on the 1983 forms.

**4.** As previously discussed, *supra* note 1, delay in bringing the indictment until termination of the charged conspiracy was permissible.

■ Given Giambalvo's failure to establish prejudice, it is not necessary to review in detail the second prong of his burden, the establishment of improper government conduct. Moreover, there is no claim here that the government intentionally delayed bringing the indictment in order to obtain an advantage. *Cf. United States v. Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2048–2049; *United States v. Lawson,* 683 F.2d at 694 (preindictment delay violates due process if causes substantial prejudice and if for improper purpose such as gaining tactical advantage).[5] Because Giambalvo has failed to meet his burden, his motion to dismiss is denied, as is the identical motion of Ungar.

## IV.

### *Government Destruction of Documents*

Giambalvo contends that, regardless of whether the destruction of the 701 forms was causally related to preindictment delay, his right to due process was violated because the forms were discoverable and exculpatory and the government destroyed them. He therefore asks for either dismissal of the indictment or for a new trial; Ungar joins this motion.

Under *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), government destruction of exculpatory evidence violates due process only if the exculpatory value of the material was apparent before the material was destroyed, and if the nature of the material was such that the defendant would not be able to obtain comparable evidence by other reasonably available means. *Id.* at 488–89, 104 S.Ct. at 2534; *accord United States v. Fletcher,* 801 F.2d 1222 (10th Cir.1986).

■ Under this stringent test, Giambalvo has failed to establish a due process violation. Assuming, *arguendo,* that the destroyed 701 forms did contain exculpatory notations, there is nothing to suggest that their exculpatory value "was apparent before the evidence was destroyed." *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. For there is no indication that FDA officials responsible for the destruction were aware of the ongoing investigation or able to assess the value to an unknown prospective defendant of particular FDA files kept in the regular course of business. Nor is there any indication that the investigatory agents who were involved in this case had reason to know prior to the forms' destruction that there was an FDA practice of putting felt-tip pen notations on the 701 forms or that the forms might be exculpatory. It is true, as Giambalvo points out, that the agents did have reason to know this after receiving the 701 forms for 1984 in response to the November 1984 subpoena. By that time, however, the 1983 forms had been destroyed. Giambalvo has therefore failed to establish that the exculpatory value of the 701 forms was apparent before their destruction. Consequently, his due process claim must fail, as must Ungar's.

Giambalvo argues further that, under the law of this Circuit, this court should impose sanctions for the FDA's destruction of the 701 forms. In this Circuit, in cases of government destruction of evidence, a balancing test is used for determining when sanctions are appropriate. *See United States v. Grammatikos,* 633 F.2d 1013, 1019–20 (2d Cir.1980) (balancing test should be employed in cases of destruction of evi-

---

**5.** The Second Circuit has not squarely addressed the question of whether negligence on the part of the government may ever be sufficient to meet the defendant's burden of improper government conduct. *See United States v. Birney,* 686 F.2d 102, 105 n. 1 (2d Cir.1982) (court declines to rule on whether, for purposes of determining constitutionality of preindictment delay, negligence may constitute illegitimate government motive); *United States v. Hodge,* 556 F.Supp. 139, 142 n. 8 (S.D.N.Y.1983) (Second Circuit has not decided propriety of dismissing indictment because of negligence in preindictment delay). Even assuming that proof of negligence will in some cases meet the defendant's burden, and even assuming that there was such proof here, negligence would not be sufficient to establish a due process violation in a case such as this, which involves only speculative prejudice. *Cf. United States v. Moran,* 759 F.2d 777, 781–82 (9th Cir.1985) (if negligent conduct by prosecutor is asserted, prejudice to defendant will have to be greater), *cert. denied,* — U.S. ——, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986).

dence); *cf. United States v. Mayersohn,* 452 F.2d 521, 525 n. 11 (2d Cir.1971) (the law that has evolved from the federal court suppression cases appears to be rooted in the appellate courts' supervisory powers); *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 571 (2d Cir.1961) (court did not need to decide if negligent suppression of evidence violated due process where to deny new trial would be inconsistent with correct administration of justice). Under the test employed by the Second Circuit:

> the appropriateness and extent of sanctions ... depends upon a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof.

*United States v. Grammatikos,* 633 F.2d at 1019–20; *see United States v. Quintana,* 673 F.2d 296, 299 (10th Cir.1982) (in cases of lost evidence, courts apply pragmatic balancing test) (citing cases), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982). Additionally, the Circuit has indicated that it

> will look with an exceedingly jaundiced eye upon ... efforts to justify non-production of a Rule 16 or Jencks Act 'statement' by reference to a 'department policy' or 'established practice' or the like

and that "[w]here ... destruction is deliberate, sanctions will normally follow." *United States v. Bufalino,* 576 F.2d 446, 449 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978); *accord United States v. Sanchez,* 635 F.2d 47, 65–66 (2d Cir.1980).

■ Applying the Second Circuit test, sanctions in this case are not appropriate. As to the first prong of the test, government culpability, Giambalvo does not dispute that the 701 forms were destroyed in the regular course of FDA business, nor does he allege bad faith. The forms were not in the possession of an investigatory agency nor kept primarily for prosecution

purposes, and there is no indication that the investigatory agents had reason to know the forms would be destroyed by the FDA, or that the forms might contain exculpatory information. In light of these factors, the government was at most negligent regarding destruction of the forms. Specifically, it may have been negligent in waiting until November 1984, four months after the end of the charged conspiracy, to serve a subpoena on the FDA, or in failing to earlier determine which, if any, FDA documents were normally destroyed in the regular course of business.

*Bufalino,* 576 F.2d at 449, and *Grammatikos,* 633 F.2d at 1019–20, do warn that government destruction of documents as a matter of "department policy" will not protect the government from a claim of violation of its duty to preserve evidence, and that sanctions will "normally follow" when destruction is "deliberate." However, it is not clear that these strong warnings are directed at the routine destruction of documents by non-investigatory agencies not requested to maintain the documents. Rather, the cases pertain to destruction of documents by investigatory agencies, or by non-investigatory agencies requested to maintain the documents. Thus, in *Grammatikos,* tape recordings made by the DEA were destroyed by the DEA; in *Bufalino,* a tape made by the FBI was destroyed by the FBI. *See also United States v. Henriquez,* 731 F.2d 131, 137–38 (2d Cir.1984) (Coast Guard acted improperly in destroying tape in regular course of business; Second Circuit requires prosecutors to instruct various agencies that tapes are not to be destroyed); *United States v. Sanchez,* 635 F.2d at 64–66 (reports of informant destroyed by DEA); *United States v. Arra,* 630 F.2d 836, 849 (1st Cir.1980) (destruction of tapes was good faith administrative error where tapes not primarily for prosecutorial purposes were erased in accordance with routine procedures having no relation to case); *United States v. Carrasco,* 537 F.2d 372 (9th Cir.1976) (reversal of conviction where DEA destroyed informant's diary). It does not appear that sanctions should "normally follow" good faith, rou-

tine destruction of records that are kept by a non-investigatory agency which is not asked to preserve the records, so long as there is no bad faith by the investigatory agency or indication that it should have known the documents would be destroyed, or of their possible exculpatory value. Rather, the appropriateness of sanctions in such a case must depend upon a pragmatic case-by-case analysis in which all factors are taken into account. *Grammatikos,* 633 F.2d at 1019–20.

Giambalvo correctly points out, however, that where destruction of documents was deliberate, cases indicate that a heavy burden is on the government to show that no prejudice resulted to the defendant. *See United States v. Sanchez,* 635 F.2d at 65 (when destruction deliberate, government has heavy burden of showing no prejudice); *United States v. Bufalino,* 576 F.2d at 449 (same); *United States v. Miranda,* 526 F.2d 1319, 1326 (2d Cir.1975) (government has burden of showing loss of evidence was not intentional, deliberate, or in bad faith), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976). If literally interpreted, these cases would require that sanctions be imposed, as there is no question but that the FDA deliberately destroyed the 701 forms and that the government has not affirmatively proved that there were no notations by Giambalvo on those forms. But, again, it is not clear that the Circuit's concept of "deliberate" destruction encompasses all routine destructions of documents by non-investigatory agencies. Moreover, *Grammatikos,* 633 F.2d 1013— which requires use of a balancing test— suggests that the appropriateness of sanctions does not stand or fall upon a government showing as to any single factor. *See id.* at 1019–20 (although government has long been on notice of duty to preserve evidence, appropriateness of sanctions depends on case-by-case analysis).

That balancing test requires an appraisal, not only of government culpability, but also of the significance of the destroyed material and its bearing upon critical issues. *Id.* As is discussed above, the defendants' claim that the destroyed 701 forms in fact contained requests by Giambalvo for inspection is speculative. Furthermore, even if the forms contained such notations and even had the forms been available to the defense at trial, such evidence, although helpful to the defense, would not have belied the fact that Kefaleas's figs were not inspected in 1983. It is also relevant that the 1984 forms containing Giambalvo's requests for inspection were placed in evidence by the defense and that counsel argued in summation that the 1983 forms might also have contained such requests. *Cf. United States v. Miranda,* 526 F.2d at 1328 (factor in court's decision not to impose sanctions for destruction of evidence was that loss of evidence was brought out in summation).

A further requirement under the balancing test is an assessment of the strength of the government's untainted proof. On these facts, "tainted" proof would presumably encompass the 702 forms corresponding to the destroyed 701 forms, and any other evidence that Kefaleas's shipments had entered the United States without inspection. Such proof, although probative, was not essential to the government's case. Proof of participation in a conspiracy does not require evidence that the objectives of the conspiracy were accomplished, and here the government had other evidence of Giambalvo's membership in the conspiracy. Specifically, there was the evidence that Ungar told Christophides that Giambalvo was his FDA contact; that Ungar regularly called the homes of Giambalvo and another supervisor at times corresponding with entries of Kefaleas's figs (with or without inspection); that those calls ceased when notice was given of the subpoenaing of phone records; that Giambalvo made a false exculpatory statement regarding those calls; that Christophides made a recorded call to Giambalvo in which Giambalvo commented that he could not talk in the office; and that Christophides called asking Giambalvo about the Zim Keelung and that Ungar had characterized Giambalvo's statement to Christophides during that call as a threat.

While this "untainted" evidence against Giambalvo is not overwhelming, it is not insubstantial. The untainted evidence against Ungar is overwhelming, given the videotapes of Ungar and Christophides.

In sum: 1) it is highly speculative whether there were requests for inspection on the destroyed forms; 2) the government was at most negligent insofar as destruction of the 701 forms is concerned; 3) the destroyed forms, although significant to the defense if they did contain notations, were not necessarily exculpating; and 4) the untainted evidence against both Giambalvo and Ungar was not insubstantial. Weighing these factors, the court denies the defendants' motions for sanctions.

SO ORDERED.