### UNITED STATES of America,

v.

### Allen GROSS, Peter Rebenwurzel, and David Malek, Defendants.

#### No. 98 CR 159(SJ).

United States District Court,
E.D. New York.

Oct. 2, 2001.

Alan Vinegrad, Acting United States Attorney by Andrew Hinton, Brooklyn, NY, for the government.

Gerald B. Lefcourt, P.C. by Gerald B. Lefcourt, Sheryl E. Reich, New York City, for defendant Gross.

Goodkind, Labaton, Rudoff & Sucharow, LLP by Mark S. Arisohn, New York City, for defendants Malek and Rebenwurzel.

## MEMORANDUM AND ORDER

JOHNSON, District Judge.

On February 12, 1998, Defendants Allen Gross ("Gross"), Peter Rebenwurzel ("Rebenwurzel"), and David Malek ("Malek"), (collectively "Defendants"), were indicted by a grand jury on charges of bank fraud and making false statements in connection with mortgage applications, in violation of 18 U.S.C. §§ 1344 and 1014. Defendants now move to dismiss the twenty-one count indictment in the above-captioned case, claiming, in part, that prejudicial pre-indictment delay has violated their due process rights under the Fifth Amendment.[1] For the reasons that follow, Defendants' motions to dismiss are granted.

## BACKGROUND

*Factual and Procedural History*

The indictment in this case is based on transactions that occurred between Gelt

---

1. Defendants' due process claim is just one of many grounds for dismissal argued in Defendants' pre-trial motions. (Mem. of Law in Supp. of Mot. by Gross, at 1; Mem. of Law in Supp. of Mot. by Rebenwurzel and Malek, at

1.) However, this Court has determined that Defendants' due process claims are dispositive as to the issue of dismissal, and therefore, the Court has chosen not to address the remainder of Defendants' claims.

Funding, Corp. ("Gelt"), a mortgage brokerage business owned and operated by Gross, and First Nationwide Bank ("FNB"), a now defunct federal stock association. As a licensed commercial mortgage broker, Gelt represented owners and potential buyers of commercial property and helped them obtain financing for their transactions. Defendants Rebenwurzel and Malek were purchasers of commercial property who, acting through Gelt, applied for and received four real estate mortgages from FNB.

In the indictment, the Government charges that between 1987 and 1989, Defendants intentionally made false representations to FNB in order to obtain loans for numerous properties in the Bronx section of New York City. The Government specifically alleges that Gelt engaged in various schemes to defraud FNB into providing Gelt with ten real estate loans and that Malek and Rebenwurzel submitted false applications, through Gelt as mortgage broker, for four such mortgage loans. As a part of this fraudulent scheme, Defendants allegedly made misrepresentations to FNB consisting of inflated underlying purchase prices, inflated down payments on properties, and inflated rent rolls reflecting the income being produced by the properties. The Government further claims that in some instances, Defendants breached a covenant not to obtain secondary financing on the properties without FNB's consent.

For a number of the properties at issue, Defendants are accused of submitting wholly fabricated documents to obtain mortgages, while in other instances, the misrepresentations were allegedly made by Defendants in conjunction with a series of "flip" transactions. In a flip transaction, the person who initially entered into a contract with the seller to buy property (the "flipper" or "initial purchaser") assigns the right to buy that property to another person who will ultimately seek the loan and actually purchase the property (the "flippee" or "subsequent purchaser"). The flipper profits from the transaction by selling the property to the flippee, at the time of assignment, for a price higher than that stated in the original contract between flipper and seller. The Government asserts that a mortgage application representing the higher price paid by the flippee as the purchase price for the real estate, rather than the lower price paid by the flipper, misrepresents the value of the property and defrauds the bank. Of added significance here is the Government's allegation that Gelt brokered numerous transactions wherein multiple flips resulted in the initial purchaser and the final flippee being the same individual.

Defendants filed pre-trial motions in January 1999, however, those motions were not fully briefed and before the Court until April 1999. This Court subsequently held a due process hearing on Defendants' motions. The hearing took place over the course of four days, commencing on September 15, 1999, continuing on February 22–23, 2000, and concluding on March 8, 2000. During the hearing, the Court heard testimony from ten witnesses and viewed evidence in order to determine both the reason for the delay in prosecution and whether the delay would in fact result in possible or actual prejudice, as argued in Defendants' motions. Between June 2000 and October 2000, the parties filed post-hearing memoranda to further clarify the issues that had been addressed at the hearing. After reviewing the record in this case, the Court makes the findings contained herein.

*Prior Litigation*

FNB previously brought federal and state civil actions against Defendants and numerous other parties which were based

on the same theory of fraud on which the instant action is premised. All of these civil actions related to FNB's claims of fraud were eventually dismissed.

In January 1992, in the Southern District of New York, FNB filed a complaint against Defendants and others, pleading two causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and seven pendent state law claims. Accepting all of FNB's allegations as true, the court dismissed FNB's complaint without prejudice for failure to state a claim upon which relief could be granted. *First Nationwide Bank v. Gelt Funding, Inc.*, No. 92 Civ. 790, 1992 WL 358759 (S.D.N.Y. Nov. 30, 1992). FNB thereafter repled its claims in an amended complaint. However, the court again found that FNB had failed to state a cause of action. *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F.Supp. 89 (S.D.N.Y.1993). The Second Circuit affirmed the dismissal of FNB's claims in the Southern District of New York and the United States Supreme Court declined to grant a writ of certiorari. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir.1994), *cert. denied*, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). In affirming the district court's dismissal, the Second Circuit stated that:

> [t]he methodology employed by FNB in determining the magnitude of the defendants' alleged overstatements of income is so defective, and the conclusions reached so defy logic, that no "reasonable inferences" can be drawn therefrom. No amount of detail can save FNB's complaint when the detail is

based on flawed and unreasonable methodologies that lead to unsupported conclusions.

*First Nationwide Bank*, 27 F.3d at 772.

Two similar actions were commenced by FNB in New York Supreme Court in 1993.[2] The state court actions alleged the same claims of fraud on which the unsuccessful federal litigation was based. The two state actions were consolidated and dismissed in their entirety. *See First Nationwide Bank v. Gelt Funding Corp.*, Index No. 125305/93, Order (N.Y.Sup.Ct. June 12, 1995). Now, nearly three years after the dismissal of FNB's state and federal civil claims against Defendants, before this Court are criminal charges stemming from the same or similar transactions.

## DISCUSSION

### I. Statute of Limitations

■ The acts charged against Defendants and alleged in the indictment occurred during the period spanning December 1987 and August 1989. Defendants were not indicted on those acts, however, until February 12, 1998. Defendants move to dismiss the indictment as time-barred, arguing that the applicable statute of limitations to be applied to this case is the five year period prescribed by 18 U.S.C. § 3282 (" § 3282").[3] The Government contends that the applicable statute of limitations for the crimes alleged in the indictment is ten years, under 18 U.S.C. § 3293 (" § 3293").

---

**2.** The second action was commenced by FNB's successor, Granite Savings Bank.

**3.** Title 18 of the United States Code § 3282 provides:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or

punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed. 18 U.S.C. § 3282 (2000).

■ Defendants were indicted under 18 U.S.C. § 1344 for bank fraud and 18 U.S.C. § 1014 for the making of false statements. Section 3293 states the following:

No person shall be prosecuted, tried, or punished for a violation of, or a conspiracy to violate—

(1) section ... 1014 ... or 1344 ...

unless the indictment is returned or the information is filed within 10 years after the commission of the offense.

18 U.S.C. § 3293 (2000). Defendants argue that § 3293 was not intended to be applied to "garden variety" bank fraud cases, as Defendants label the instant action. While Defendants' arguments regarding the intent of Congress in enacting § 3293 are not completely without merit, this Court finds that given the clear language of the statute, the applicable statute of limitations for violations of 18 U.S.C. §§ 1344 and 1014 is ten years.[4] *See Greenery Rehabilitation Group, Inc. v. Hammon,* 150 F.3d 226, 231 (2d Cir.1998) ("[i]n interpreting a statute, we must first look to the language of the statute itself"). Only if a statute is ambiguous should the court turn to other methods of statutory interpretation such as legislative history. *See In re Olga Coal Co.,* 159 F.3d 62, 67 (2d Cir.1998). There is no ambiguity in the text of § 3293, therefore, the applicable statute of limitations to be applied is ten years.

## II. Pre–Indictment Delay and Due Process Considerations

■ Defendants argue that the charges against them should be dismissed because delay in bringing the indictment violated their constitutional right to due process under the Fifth Amendment. Generally, the statute of limitations safeguards against the bringing of stale charges. *See United States v. Ewell,* 383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). In *United States v. Marion,* the United States Supreme Court stated that "[t]he purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *United States v. Marion,* 404 U.S. 307, 323, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The *Marion* court also recognized, however, that in cases of actual, as opposed to possible, prejudice, the statute of limitations may not ensure that the charges brought against a defendant comport with constitutional principles of due process. In such cases, the Due Process Clause of the Fifth Amendment protects defendants against excessive pre-indictment delay. *See Marion,* 404 U.S. at 324, 92 S.Ct. 455; *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

■ A successful claim for dismissal based on pre-indictment delay must establish that permitting the Government

4. As Defendants correctly assert, § 3293 was enacted in 1989, as part of the Congressional response to the savings and loan scandals, and increased the limitations period for certain charges of financial institution fraud from five to ten years. The enhanced limitations period was intended to assist the Government in prosecuting complex fraud cases relating to savings and loans, many of which involved situations where the perpetrators had attempted to conceal their crimes through a web of fraudulent transactions and which required additional time and investigation to untangle. *See* H.R.Rep No. 101–54(I) at 464–65 (1989).

to proceed to trial against the defendant would be so unfair as to violate "fundamental conceptions of justice which lie at the base of our civil and political institutions ... and which define 'the community's sense of fair play and decency.'" *Lovasco*, 431 U.S. at 790, 97 S.Ct. 2044 (citations omitted). It thus follows, that as part of such a showing, a defendant must prove actual prejudice to his right to a fair trial. *Id.* at 789, 97 S.Ct. 2044 (finding that "proof of actual prejudice makes a due process claim concrete and ripe for adjudication"); *United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir.1990) (concluding that to establish denial of due process based on excessive pre-indictment delay, a defendant must show that he was prejudiced by the delay). Upon a finding of actual prejudice, the Court must next consider the government's proffered reasons for the delay. *Lovasco*, 97 S.Ct. at 2049.

There is no dispute among the parties that Defendants must, as an initial matter, prove that they were prejudiced by the Government's delay in bringing the instant indictment. Defendants and the Government disagree, however, with respect to the standard to be applied in analyzing the Government's justification for the delay once prejudice has been established. The Government, citing *Lovasco*, *Marion*, and *United States v. Hoo*, argues that Defendants must show that the pre-indictment delay was intentionally caused by the prosecution to gain a tactical advantage or for some other improper or inappropriate prosecutorial purpose. *See United States v. Hoo*, 825 F.2d 667, 671 (2d Cir.1987). Defendants contend, even in light of the authority relied on by the Government, that a standard other than intentional governmental misconduct may be applied. *See United States v. Birney*, 686 F.2d 102, 105 n. 1 (2d Cir.1982).

■ The Government is correct in asserting that this Circuit has interpreted *Marion* and its progeny to require that a defendant show: 1) that the pre-indictment delay resulted in actual prejudice; and 2) that the delay was "an intentional device to gain tactical advantage over the accused." *Hoo*, 825 F.2d at 671; *accord Scarpa*, 913 F.2d at 1014; *United States v. Lawson*, 683 F.2d 688, 694 (2d Cir.1982); *United States v. Oliver*, 683 F.Supp. 35, 41 (E.D.N.Y.1988); *United States v. Stanzione*, 466 F.Supp. 838, 843 (E.D.N.Y. 1979).

The Government's argument is diluted, however, by the fact that neither the Second Circuit nor the Supreme Court has squarely addressed whether a state of mind short of intent, such as negligence, could fall within the rubric of governmental misconduct. In *Marion*, the Supreme Court did not reach this issue because the *Marion* defendants alleged only potential, and not actual, prejudice. *Marion*, 404 U.S. at 324, 92 S.Ct. 455. Six years later in *Lovasco*, the Supreme Court addressed when a delay by the government would *not* be violative of the Due Process Clause and found that investigative delay differed from governmental delay for the purpose of gaining a tactical advantage and was not unconstitutional. *Lovasco*, 431 U.S. at 796, 97 S.Ct. 2044. In *Lovasco*, the government did concede, however, without any findings by the court on the issue, that "a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution" might constitute a due process violation. *Id.* at 796 n. 17, 97 S.Ct. 2044.

The Second Circuit has specifically declined to reach the question of "the propriety of dismissing an indictment for reason of prosecutorial negligence." *Birney*, 686 F.2d at 105 n. 1. In *Birney*, the defendant's claim of pre-indictment delay was

deemed meritless because the defendant failed to establish actual prejudice, and therefore, the *Birney* court was not required to analyze the government's proffered reasons for the delay. *Id.* at 106. The *Birney* court did note, however, that other circuits had dismissed indictments after expressing varying views as to what type of governmental conduct would result in a due process violation. *Id.* at 105 n. 1.

The Fourth, Seventh, and Ninth Circuits have dismissed indictments based on a standard other than governmental intent to achieve a tactical advantage. In *United States v. Moran,* 759 F.2d 777, 782 (9th Cir.1985), the Ninth Circuit announced a balancing test, wherein once a court finds that pre-indictment delay resulted in actual prejudice to a defendant, that prejudice must be weighed against the reasons for the delay articulated by the government. *See also United States v. Ross,* 123 F.3d 1181, 1185 (9th Cir.1997). However, the *Moran* court found that where "mere negligent conduct by the prosecutors is asserted, ... the delay and/or prejudice suffered by the defendant will have to be greater." *Moran,* 759 F.2d at 782. Moreover, the Fourth and Seventh Circuits have announced similar balancing tests. *See e.g., Aleman v. The Honorable Judges of the Circuit Court,* 138 F.3d 302, 309 (7th Cir. 1998) (due process violation in the context of pre-indictment delay is decided under a balancing test); *Jones v. Angelone,* 94 F.3d 900, 904 (4th Cir.1996) (applying analysis where "assuming the defendant can establish actual prejudice, ... the court must balance the defendant's prejudice against the government's justification for delay.")

District courts have also recognized that differing levels of prosecutorial misconduct may support a pre-indictment delay due process claim. Within this Circuit alone, more than one district court has either dismissed an indictment after a finding of negligence or reckless disregard on the part of the government, or has simply acknowledged that the circumstances of a particular case may result in the lack of clear precedent. In *United States v. Morrison,* the defendant's motion to dismiss for pre-indictment delay was granted based on a finding that the government's "gross negligence" had deprived the defendant of the opportunity to interview and present witnesses who may have provided exculpatory testimony. *United States v. Morrison,* 518 F.Supp. 917, 919 (S.D.N.Y. 1981). *See also Schurman v. Leonardo,* 768 F.Supp. 993, 998 (S.D.N.Y.1991) (noting that dismissal for excessive pre-indictment delay is permissible when defendant makes a showing of actual prejudice combined with either government delay to gain a tactical advantage over the accused or delay resulting from the "reckless disregard of the circumstances" by the government); *United States v. Ungar,* 648 F.Supp. 1329, 1335 n. 5 (E.D.N.Y.1986) (recognizing that the Second Circuit has not squarely addressed the question of whether negligence on the part of the government may ever be sufficient to meet the defendant's burden of improper government conduct) (citations omitted).

One of the most persuasive and well-reasoned district court cases which contemplated this issue is *United States v. Sabath,* 990 F.Supp. 1007 (N.D.Ill.1998). In *Sabath,* the court dismissed the indictment on due process grounds after finding that pre-indictment delay had prejudiced the defendant by resulting in the loss of "critical" witness testimony and other evidence. *Sabath,* 990 F.Supp. at 1010–11. After determining that the defendant had been prejudiced by the more than five and one-half year delay in bringing the indictment, the court found that the government was, at the very least, reckless in contributing to the delay. *Id.* at 1019. In ex-

plaining its decision to deem such recklessness sufficient to satisfy the defendant's burden of proving governmental misconduct, the *Sabath* court followed the balancing test announced by the Seventh Circuit in *United States v. Sowa*, 34 F.3d 447 (7th Cir.1994), and noted that the bright-line rules applied in other circuits, requiring that a defendant prove governmental intent to gain a tactical advantage, set an impossible threshold for criminal defendants to overcome. *Sabath*, 990 F.Supp. at 1018.

■ While varying standards have been applied in analyzing prosecutorial misconduct and pre-indictment delay, every court has recognized that these determinations are fact-based inquiries which turn on the circumstances particular to each individual case. *See Marion*, 404 U.S. at 324–325, 92 S.Ct. 455 (noting that the court could not determine "when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution" and stating that balancing the sound administration of justice and the rights of the defendant to fair trial will "necessarily involve a delicate judgment based on the circumstances of each case."); *Lovasco*, 431 U.S. at 797, 97 S.Ct. 2044 (refusing to set a bright-line rule and charging the lower courts with "the task of applying the settled principles of due process ... to the particular circumstances of individual cases."); *Aleman*, 138 F.3d at 310 (finding it improper to "recognize a conclusive presumption in a due process inquiry, which the Supreme Court has frequently emphasized should be flexible and highly fact-specific") (citations omitted). Guided by these principles, the Court now turns to the facts of the instant action.

### A. Actual Prejudice

■ Defendants may not move forward with their due process claim without first showing that they have been prejudiced by the Government's delay in bringing the indictment. Proof of prejudice must be definite, not speculative. *See Birney*, 686 F.2d at 105–06; *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir.1979). A defendant's allegations must be particularized in order to "overcome the presumption of legitimacy that attaches to an indictment brought within the applicable statute of limitations period." *Beverly v. Walker*, 899 F.Supp. 900, 909 n. 5 (N.D.N.Y.1995), *aff'd*, 118 F.3d 900 (2d Cir.), *cert. denied*, 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997).

■ A claim of prejudice is typically understood to mean the sort of deprivation that impairs a defendant's right to a fair trial. *Elsbery*, 602 F.2d at 1059. Such a deprivation may result from the loss of documentary or testimonial evidence that would have been available to the defense had the charges been brought more promptly. *See United States v. Hillegas*, 578 F.2d 453, 460 (2d Cir.1978). Accordingly, "[f]aded recollections and missing peripheral witnesses" are insufficient to support such a claim, *see United States v. Rubin*, 609 F.2d 51, 66 (2d Cir. 1979), however, the death of a credible, crucial witness combined with lost evidence may result in a finding of actual and severe prejudice to a defendant. *See Sabath*, 990 F.Supp. at 1013.

■ In the instant case, nearly ten years elapsed between the time of the conduct alleged in the indictment and when charges were finally brought against Defendants. Defendants' claim of prejudice, however, is based on far more than the mere passage of time. Defendants claim that during those ten years, documents and other evidence were lost, businesses in possession of critical documents collapsed, and witnesses died. Defendants

claim that were this evidence available to them, it would be used to show that some of the representations attributed to Defendants were made by other parties and that FNB was aware that it was financing flip transactions. Therefore, Defendants argue that they have suffered extreme and actual prejudice to their ability to defend themselves against the instant charges. This Court agrees.

### Missing Documents

During the hearing in this matter, the Court heard testimony from numerous witnesses and received volumes of documentary evidence intended to establish which documents in this case were missing, the reason for their loss, and the role those documents would have played in Defendants' case. Of the witnesses called to testify regarding the missing documents, two of those witnesses were qualified as experts by the Court. The first of those experts, Leonard Grunstein ("Grunstein"), is an attorney and at the time of the hearing was a partner at the law firm of Herrick, Feinstein LLP, specializing in real estate law. Grunstein testified that he had been the head of Herrick, Feinstein's co-op and condominium group prior to becoming the head of the real estate department. (Tr. at 8.)[5] Grunstein further testified that in addition to his work at Herrick Feinstein, he has lectured at Cardoza Law School in the area of co-op and condominium practice, personally organized New York Federal Savings Bank, participated in the organization of the Metropolitan National Bank, served as a board member and officer for several banks, and provided legal representation to numerous financial institutions. (Tr. at 8–9.) As a result of Grunstein's banking and real estate experience, the Court qualified him as an expert in real estate financing and banking procedure.

Grunstein confirmed that he had reviewed all documents provided by the Government and identified as coming from FNB's files. (Tr. at 10.) After examining those files, Grunstein compiled a list of 42 prototypical documents that, through his review of FNB's procedures, he would expect to find in each file relating to one of the ten transactions with which Gross is charged. (Tr. at 14.) Grunstein further testified to the significance of each of the 42 prototypical documents. For example, an assignment of purchase and sale agreement is needed to establish the connection between the original purchaser and the subsequent borrower in a flip transaction. (Tr. at 18.) Without this document, Grunstein testified, the Bank could not establish any connection between the property and the borrower who is seeking to borrow against the property. (Tr. at 20–21.) An original loan application is the form in which a borrower makes representations to the bank in order to establish basic details about the property, such as the purchase price and the identity of the borrower. (Tr. at 34.) However, for the ten transactions at issue in the Gross indictment, eight initial loan applications are missing from FNB's files. (Tr. at 23–24, 29, 33.) Contrary to the Government's assertions, Defendants have provided ample evidence as to the existence of missing documents by identifying other documents in FNB's files which reference the missing documents. In fact, from a review of the summary of the missing documents prepared for the Court by Defendants, it appears one in four of the 42 "prototypical" documents is missing from the ten files relating to the Gross transactions. (Defs.' Ex. L.) Finally, Grunstein testified that it would be "difficult to believe," "exception-

5. "Tr." refers to the transcripts of the hearing held 9/5/99, 2/22/99, 2/23/99, and 3/8/00.

al," and "extremely unusual" for these documents to not have existed. (Tr. at 35.)

Not only are many initial loan applications missing, but several documents which would have been submitted to the bank in support of these applications are missing as well. These include rent rolls and borrowers certificates. Grunstein testified that the initial rent roll, in which the prospective borrower makes representations as to the rents of individual apartments and the income of the building against which the loan is being sought, is an essential part of a mortgage transaction. (Tr. at 44.) Four of ten rent rolls are missing, however, other documents within FNB's files reference their existence. (Tr. at 43.) Finally, Grunstein's testimony established that borrower's certificates, the document through which the applicant establishes other loans on which he is liable to the bank, were missing in seven of ten transactions. (Tr. at 49.) All of the above-referenced missing documents are critical to Defendants' case and their ability to show who made what representations to the bank, when those representations were made, and FNB's knowledge as to the nature of the transactions at issue.

The second expert witness to testify was Robert Engel ("Engel"). Engel is a CPA and the retired former Chief Banking Officer of HSBC Bank. (Tr. at 351.) During his career in the banking industry, Engel held positions at several banks in which he was responsible for bank record keeping in the area of commercial real estate lending. (Tr. at 352.) After hearing testimony regarding both Engel's credentials and state and federal banking regulations, the Court qualified Engel as an expert in the area of record keeping in commercial lending. (Tr. at 354.)

Engel testified that he examined FNB's entire file for two of the ten transactions charged in the indictment. (Tr. at 355.)

Like Grunstein, Engel testified that documents relating to prior applicants should have been in the files and, affirming Grunstein's assertions, Engel stated that a bank would have necessarily obtained an original loan application for each flip transaction. (Tr. at 357.) Engel concluded that not only were critical documents missing from those files, but that, in his experience, no bank would have proceeded with the loan process without those documents. (Tr. at 356–57.) In sum, both experts opined that FNB had a good reputation, that the files presented were substantially deficient in critical documents, and that both internal and external banking regulations would have prevented FNB from keeping its records in this manner in the regular course of business.

As with the ten files relating to the charges against Gross, documents are missing for each of the four transactions on which the charges against Malek and Rebenwurzel are predicated. In fact, of 168 documents which should be present for those four transactions, it appears that nearly a third are missing. (Defs.' Ex. FF). Furthermore, Defendants have questioned the authenticity of documents contained in FNB's files, and as conceded at the hearing by an FBI agent assigned to this case, Randall Avery ("Avery"), missing originals would make it far more difficult to reach conclusive determinations on this issue. (Tr. at 438–39.) Even though, as Defendants correctly assert, original documents are essential to any case alleging fraud and misrepresentation, Avery further testified that he never attempted to locate FNB's original files and has no idea whether those files exist or where they might be located. (Tr. at 470.)

The testimony of Cheryl Reich ("Reich"), counsel to Gross, further established the significance of the missing evidence. Not only did Reich provide further

support for Defendants' assertions that documents were missing from FNB's files, but Reich explained to the Court the resulting prejudice to Defendants. According to Reich, the missing documents would be critical to Defendants receiving a fair trial on the misrepresentations alleged. (Tr. at 195–200, 203–204.) Reich testified that without many of these documents, Defendants could not convince a jury who made representations to the bank and when the representations were made.[6] (Tr. at 196.) Finally, Reich testified that nearly half of the subpoenas written by the Government seeking documents in this case were lost. (Tr. at 213–14.) It is therefore impossible for this Court to determine, in light of the number of documents missing from FNB's files, exactly what evidence the Government sought to obtain.

The Court finds merit in Defendants' argument that without the documents missing from FNB's files, Defendants cannot conclusively show who made the false statements to FNB and when those statements were made. Moreover, the delay in bringing these charges has resulted in the near impossibility of Defendants locating the missing documents. FNB no longer exists and the law firm that represented FNB in the civil litigation in the Southern District of New York has disbanded.[7]

*Missing Witnesses*

The three witnesses which, were they alive, Defendants claim would corroborate their version of events are Rabbi Itzack Isbee, John Donohoe, and Frieda Roth.

While the Court cannot conclude that the unavailable testimony of these witnesses alone would result in prejudice to Defendants, the Court does consider that each of these deceased witnesses had long-term knowledge of the history of this case and of the allegedly illegal and unethical conduct underlying the transactions at issue. In particular, the Court is not convinced that Abraham Roth can adequately substitute for the testimony of Frieda Roth, an employee of Gelt's accounting firm, Abraham Roth & Co. In fact, Abraham Roth has affirmed that while he is aware that his wife found false documents and irregularities in her review of Gelt's files, he is unable to locate any "notes, memorandum, work papers, or other documents which would indicate her finding." (Aff. of Abraham Roth, ¶ 6.) These missing witnesses, when considered in combination with other missing evidence, weigh in favor of Defendants' claim that they were prejudiced by the Government's nine year delay in bringing these charges.

### B. The Government's Reasons for the Delay

■ The Government's states that "virtually all of the delay in this case was 'investigative delay.'" (Gov't Mem. of Law in Opp'n to Defs' Pretrial Mots. at 36.) The Government further represents that the delay was due to "the process of gathering evidence in this matter, which involved the interview of dozens of witnesses and the review of hundreds of thousands of pages of documents ..." (*Id.* at 37.) In summary, the Government asserts that

---

6. Sheldon Rudoff ("Rudoff"), one of the attorneys who represented Malek and Rebenwurzel in the SDNY civil litigation and partner in the the law firm of Goodkind, Labaton, Rudoff & Sucharow, expressed a similar theory as to the prejudicial impact of the missing documents. (Tr. at 246–249.)

7. An attorney who previously represented Defendant Gross on behalf of the law firm of Certilman, Balin, Adler & Hyman, LLP has affirmed that numerous changes in Gross's legal representation over the many years of civil litigation in these matter have resulted in the loss of documents critical to Gross' case. (Broffman Aff. ¶ 15, 6, 7.)

"the vast majority of the time in which defendants direct their complaints was spent on legitimate investigation." (*Id.* at 38.) The Government cites *United States v. Laurenti,* 581 F.2d 37 (2d Cir.1978), and *United States v. DeMasi,* 445 F.2d 251 (2d Cir.1971), in support of the proposition that what they have labeled investigative delay is permissible.

As an initial matter, based on the evidence presented, this Court rejects the Government's attempts to categorize the delay in this case as investigative delay. The Government's investigation in this case commenced in February 1992 and the indictment was returned in February 1998, ten years after most of the transactions at issue occurred and six years after the start of the investigation. There is no indication whatsoever, from the evidence adduced at the hearing before this Court, that these six years were used for the type of "careful investigation" deemed acceptable by the Second Circuit. *Laurenti,* 581 F.2d at 44; *DeMasi,* 445 F.2d at 255.

A chronology of investigative activity on the case was provided by the Government. (Gov't.Ex. 30.) This chronology indicates that in six years, there was Government activity in this case for a total of only 94 days. The Court notes that during those six years, the Government's failure to act was evidenced by large gaps of time with no case activity whatsoever. (Gov't.Ex. 30.) In addition, there were a number of grand jury subpoenas which remained outstanding for years with no compliance. (Def. Ex. AA; Tr. at 271.) Finally, the case was shifted among a total of four Assistant United States Attorneys ("AUSA"s). The first AUSA was assigned to the case for only three to four months before being relieved to work on a "primary matter." (Tr. at 370.) In the fall of 1992, another AUSA was assigned to the case and remained on the investigation until the summer of 1994, at which time he was replaced with an AUSA who could devote more time to the case. (Tr. at 287–289, 298–299.) The third AUSA to staff this matter, was admittedly unable to devote the sustained attention to the case which was necessary to arrive at an indictment. (Tr. at 321.) He remained on the case, however, until early 1996 when it was assigned to a fourth AUSA. (Tr. at 321.) Nearly two years after the fourth AUSA was assigned, an indictment was finally brought.

Reich's hearing testimony provided additional support for Defendants' contentions that the Government's delay was not investigative delay. Reich testified that in her many years as a trial lawyer, she had never seen an investigation proceed so slowly with only intermittent and sporadic activity over such a long period of time. (Tr. at 187–188, 217.) Reich further testified that because of the lack of activity, there were many times between 1994 and 1997 when Defendants believed that the investigation was "dead." [8] (Tr. at 179–181, 216–17.) Furthermore, Reich's testimony revealed that although Gelt had brokered thousands of transactions with FNB, it was not until early 1997 that Defendants were told by the Government that only four to six of those transactions were under investigation. (Tr. at 182–83, 186.)

8. Sheldon Rudoff, one of the attorneys who represented Malek and Rebenwurzel in the SDNY civil litigation and a partner in the law firm of Goodkind, Labaton, Rudoff & Sucharow, also testified that after speaking to investigators about the grand jury investigation of Malek and Rebenwurzel in late 1992 or early 1993, he did not hear from the Government again regarding this case until November of 1997. (Tr. at 243–44.) The lack of contact over that five year period led Rudoff to believe that the investigation was over. (Tr. at 244.)

Reich testified that she was told by Avery in January 1997 that the case against Defendants had been ready for indictment for two years but he had been unable to get an AUSA to focus on this matter. (Tr. at 188.) That same month, Reich was advised by the Government that they were four to six weeks from bringing an indictment against Defendants. (Tr. at 182–83.) After receiving this information, Reich made several attempts to contact the Government for more information regarding the exact transactions which would be the subject of the indictment, however, the Government did not respond to Defendants' inquiries until December of 1997. (Tr. at 186.) Shortly thereafter, Defendants were charged in a criminal indictment which, though allegedly the result of six years of investigation, was premised on the same claims which comprised the previous civil complaints against Defendants, all three of which were dismissed many years earlier. (98 CR 159, Chaser Docket Sheet, entry # 1; Not. of Pre-trial Mot. of Gross, Ex. E, F; Tr. at 193–94, 244–245.)

### C. Due Process as Applied to this Case

In applying the foregoing principles to the facts of this case, the Court finds that Defendants have suffered actual and severe prejudice as a result of the Government's extreme delay in bringing the indictment. The Court further finds that the delay was caused by the Government's failure to act in prosecuting these charges. Moreover, the Government's explanations do not reveal any legitimate investigatory reason for the delay or serve to otherwise justify the prejudice suffered by Defendants. As a final matter, this Court recognizes that the Office of the United States Attorney deserves and will continue to receive wide latitude in managing its resources and exercising its prosecutorial discretion. The Court further notes that in the vast majority of cases prosecuted in this Court by the United States Attorney's Office, the discretion afforded federal prosecutors serves, rather than disrupts, the ends of justice. However, in rare instances, such as those presented here, the Court must intervene to ensure that the constitutional rights of criminal defendants are not violated by the prosecutorial process.

In arriving at this decision today, the Court does not rely on one critical document or one piece of missing testimony, but considers the totality of circumstances resulting from the delay. As the Court has determined that a fair trial in this case is nearly impossible, and criminal prosecution of Defendants would violate fundamental notions of fair play and decency, the indictment against Gross, Rebenwurzel, and Malek must be dismissed in the interests of justice.

### CONCLUSION

For the foregoing reasons, the indictment against Defendants Gross, Malek, and Rebenwurzel is hereby dismissed in its entirety.

SO ORDERED.